**CITY OF HOUSTON and American Airlines, Inc., Petitioners,**

**v.**

**FEDERAL AVIATION ADMINISTRA-TION, et al., Respondents.**

**Nos. 80-2030, 80-2251 and 81-4194.**

United States Court of Appeals,
Fifth Circuit.

July 9, 1982.

Robert E. Cohn, Jeffrey W. Jacobs and Bruce A. Leicher, Washington, D. C., for City of Houston.

John L. Oberdorfer, Washington, D. C., for City of Birmingham.

Charles H. White, New Orleans, La., for City of New Orleans and New Orleans Aviation Bd.

Patricia Nalley Bowers, Asst. Atty. Gen., Louisiana Dept. of Justice, New Orleans, La., for State of La.

Barry S. Spector, Washington, D. C., for Northwest Airlines, Inc.

Marshall Coleman, Atty. Gen., Richmond, Va., for Commonwealth of Va., her Counties of Fairfax and Loudoun and the City of Alexandria.

Lawrence J. Latto, Washington, D. C., for Virginians for Dulles.

Sharon E. Pandak, Asst. County Atty., Manassas, Va., for Prince William County.

Edward J. Finnegan, County Atty., Leesburg, Va., for Loudoun County, Va.

Peter R. Steenland, Jr., Edward Faggen, Washington, D. C., Kenneth N. Weinstein, Dept. of Transp., Anne S. Almy, James W. Moorman, Thomas L. Reisenberg, U. S. Dept. of Justice, Land & Natural Resources Div., Washington, D. C., for Federal Aviation Administration, et al.

Richard J. Fahy, Jr., Stephen L. Taylor, American Airlines, Inc., Dallas/Ft. Worth Airport, Tex., John C. Christian, New Orleans, La., for American Airlines, Inc.

Michael Goldman, Washington, D. C., for Pan American World Airways, Inc.

Bert W. Rein, Tom Kirby, Washington, D. C., for U. S. Air, Inc.

David T. Stitt, Fairfax, Va., for Fairfax County, Va.

Before BROWN, GOLDBERG and GEE, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

This flight from Houston, Texas to our Nation's Capital takes us to both Dulles International and Washington National Airports. The Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.*, will serve as our flight plan, and the Supreme Court as air traffic control. In the course of our flight, our passengers—the City of Houston, American Airlines and the Federal Aviation Administration [1]—will be informed of our conclusion that Department of Transportation regulations imposing a "perimeter rule" upon flights to and from Washington National Airport are valid and thus, as we disembark, we shall deny the petitions for review.

*Destination: Washington—A Capitol City*

Our Nation's Capital, Washington, D. C., attracts millions of visitors each year, be it for pleasure or for business. Nestled in the green hills of the Mid-Atlantic region, snug and smug along the banks of the beautiful Potomac River, this celebrated town of "Northern charm and Southern efficiency" offers visitors a potpourri of museums, art galleries, monuments, historic sites, parks, Panda bears, politicans, and a climate that is charitably described as ghastly. And for one group of travelers, Washington offers something else: our federal government, with its milch cow departments and regulatory agencies. For the business traveler, Washington is Mecca.

*One If By Land, Two If By Sea, and
Three If By Air*

Yet the road to Mecca is.not an easy one. The metropolitan Washington area supports three airports: Washington National (National), Dulles International (Dulles)—both owned by the FAA, an arm of the DOT—and Baltimore-Washington International (BWI). For those citizens living within 1,000 miles of Washington, nonstop air service to close-in National allows them to earn their wings, every day. Served directly by Metro, Washington's vintage 2001 subway network, National lies across the Potomac River from downtown Washington, a few minutes' ride from the seat of government and from most of its appendages as well.

If Washington is the city of cherry blossoms, National is a faded bloom. Constructed in the early 1940's to handle propeller planes, it now handles jet aircraft which disgorge up to 3500 passengers/hour in peak periods, for a total of 17 million passengers per year. Those figures represent 67% of the air traffic in the metropolitan Washington area. National's 6870 foot runway can handle Boeing 727's and similar jet aircraft but cannot accommodate the "jumbo" widebody jets that serve the coast-to-coast and international markets. To the west of the airport is Arlington County, Virginia, and to the south, the city of Alexandria, Virginia—both densely populated areas [2] whose residents with increasing vehemence have protested the noise and congestion that National engenders. *See*

---

1. The names on the passenger manifest for this flight include the City of Houston, Texas (Houston) and American Airlines (American), as petitioners, and, as respondents, three agencies of the federal government—the Federal Aviation Administration (FAA), the Department of Transportation (DOT), of which the FAA is itself a branch, and the Civil Aeronautics Board (CAB), an independent regulatory agency. For the list of passengers amici curiae and intervenors, *see* note 9, *infra.*

2. Within the "30 NEF" area around the airport—NEF means Noise Exposure Forecast, a noise measure that takes account of the effects of peak noise levels, number of aircraft operations, and time of day, and 30 NEF and above is considered unsuitable for residential development—are large residential areas, parks, and the Alexandria "Old Town" historic district.

*Virginians for Dulles v. Volpe*, 344 F.Supp. 573 (E.D.Va.1972), *aff'd. in part, rev'd. and remanded in part*, 541 F.2d 442 (4th Cir. 1976).

### You Can't Get There From Here

For those travelers who live beyond 1000 miles from Washington, only a flying carpet can assure them nonstop service to National, since the DOT regulations we confront prohibit such flights. They may select from two alternatives: a non-nonstop flight to National, stopping or changing planes in a city less than 1000 miles distant, or a direct flight to Dulles or Baltimore-Washington Airport.

Dulles, the other federal airport, is National's younger and substantially more glamorous sister. Completed in 1962, situated 26 miles west of downtown in the rolling green hills of Loudoun and Fairfax Counties in Virginia, Dulles boasts one of the most spectacular terminals in the world. Designed by the architect Eero Saarinen, the terminal possesses a roof that defies both gravity and common sense, modern facilities, comfortable mobile lounges that carry passengers from the terminal building out to an awaiting plane and thus eliminate much of the walking endemic to airports, and, what is central here, three 10,000 foot runways that can accommodate any and all airplanes currently constructed.[3] The first airport in the nation planned for jet aircraft, Dulles services the bulk of nonstop flights from Washington to the West Coast and abroad.

For all its attributes, however, Dulles suffers from one small problem: unpopularity. The 30-mile trip to Washington from Dulles doth a lengthy and expensive taxi ride make. Ground transportation to downtown by bus or limousine, while not as expensive, still takes approximately 45 minutes in light traffic. Rapid rail transport along the Dulles Access Road, a limited access parkway that services only the airport, is unlikely to begin in the near—or even distant—future. Thus travelers arriving in Washington generally prefer National, however crowded, however congested, however decrepit, to the spacious and graceful, but inconvenient, Dulles. Traffic figures confirm its loneliness. While Dulles can accommodate 1800 passengers per hour, the total daily average passenger load is less than 7000. And since the majority arrive or depart late in the afternoon, when the crowded West Coast flights are scheduled, the daily average figures are deceptive.[4] As overcrowding plagues National, arousing the ire of its neighbors, during most of the day the younger sister pines away, unwanted.

The FAA, like any prudent entrepreneur, seeks to increase business and has resorted to the regulatory process to attempt to transfer "long-haul" flights to Dulles. The City of Houston and American complain. And on that note, we must fasten our seat belts, for our flight begins.

### Pre-Flight Procedure

American and Houston seek review of DOT regulations imposing a "perimeter rule" that prohibits air carriers from operating nonstop flights between National and any airport more than 1000 statute miles away. 46 Fed.Reg. 36068 (1981), 14 CFR § 159.60. The procedural background to this rule could fill several Boeing 747's. Lest we deter the reader, we will throttle back on unnecessary details.

Prior to the dawn of the jet age, the air carriers serving National agreed to a 650-mile perimeter rule[5] on nonstop flights to

---

**3.** Dulles is one of two airports in the United States that services the Concorde, the supersonic jet aircraft which makes daily runs to London and Paris in approximately four hours.

**4.** American and Houston point out that Dulles currently is undergoing construction and argue, in effect, that where there is the smoke of construction, there must be the fire of over-

crowding. They are incorrect. The changes at Dulles merely eliminate some design problems and increase the ease of arrival and departure. With the exception of the crowded afternoon hours, however, the terminal still sits empty.

**5.** The airlines filed the agreement with the Civil Aeronautics Board (CAB) which approved it.

and from National, with exceptions for seven cities between 650 and 1000 miles away which enjoyed grandfathered nonstop service as of December 1, 1965.[6] The agreement expired on January 1, 1967, but the carriers continued to adhere to its terms until May 1981, when three carriers—American, Pan American and Braniff—announced plans to fly nonstop to National from cities outside the perimeter.

The perimeter rule did not rest upon operational or safety considerations—all parties concede that the Boeing 727's that land at National have a range well beyond 1000 miles. Rather, the FAA viewed the rule as a means of controlling the increasing traffic at National. The rule did not placate area residents, who found the noise from jet aircraft equally disturbing whether the flight originated within 1000 miles or on the Moon. The neighboring states of Maryland and Virginia, the District of Columbia, local planning organizations, and area Senators and Congressmen all urged the FAA to "do something" about National. In 1970, a coalition of citizen groups and individuals brought suit against the DOT, FAA and eleven major airlines to abate noise and air pollution at the airport. The U.S. Court of Appeals for the Fourth Circuit ordered the FAA to prepare an Environmental Impact Statement (EIS) concerning its operation of its two airports. *See Virginians for Dulles, supra,* 541 F.2d at 445–46.

Responding to the Fourth Circuit's flight instructions, the FAA on March 23, 1978 issued a Notice of Proposed Policy for the Metropolitan Washington Airports and a draft EIS. 43 Fed.Reg. 12141 (1978). In discussing a wide range of policy options, from no change to various restrictions on growth, the proposal declared as its purpose "to rationalize the role and use of the two airports [National and Dulles] from an overall transportation viewpoint." The FAA solicited and received comments from the public, members of Congress, federal agencies, state, municipal and local agencies, public organizations, private companies, and interested individuals.

The comments fell into two categories. Local governments and residents argued that the concentration of service at National imposed an unnecessary burden on the airport's neighbors. The airlines and distant cities, on the other hand, argued that National's convenience outweighed the objections.

The FAA, after further public comment, modified its 1978 proposal and issued a supplementary draft EIS and a Notice of Proposed Rulemaking in January 1980. 45 Fed.Reg. 14314 (1980). For the first time, FAA mentioned a flat 1000-mile rule as an alternative to the existing policy. Still more comments followed. The House Committee on Public Works and Transportation got into the act and held oversight hearings.

In response, FAA further refined its policy proposal. The final EIS appeared in August 1980. It contained five policy alternatives, essentially variations on a theme. None suggested abandonment of the perimeter rule.

On August 15, 1980, then-Secretary of Transportation Goldschmidt unveiled an amended Metropolitan Washington Airport Policy. 45 Fed.Reg. 62398 (1980). The FAA issued several regulations to implement this policy, *Id.* at 62406, which abolished the 650-mile perimeter and its exceptions and replaced it with a flat 1000-mile perimeter. In support of the new rule, FAA advanced three reasons:

(1) To assure the full utilization of Dulles;

(2) To preserve the short- and medium-haul nature of National; and

(3) To eliminate the inequity that the prior rule, with its exceptions for the grandfathered cities, created.

The new policy also set a ceiling of 17 million passengers per year at National,

---

Agreement of the CAB ¶ 187–81, CAB order E–23743 (1966).

**6.** These "grandfathered" cities were: Minneapolis-St. Paul, St. Louis, Memphis, Orlando, Miami, Tampa, and West Palm Beach.

changed the distribution of slots[7] between certificated air carriers and air taxis, imposed a strict curfew on departures and arrivals at night, removed the restriction on those widebody aircraft that can safely operate on National's short runway, called for a master plan governing physical redevelopment of National, and required Dulles to remain open 24 hours per day with unrestricted access.

### We've Only Just Begun

These rules were to take effect on January 5, 1981. Just when it seemed that FAA had taken a giant step for traveling mankind, Congress stepped in and prohibited the FAA from reducing the number of air carrier slots until April 26, 1981. *See* Department of Transportation and Related Agencies Appropriations Act of 1981, Pub.L. 96–400, 94 Stat. 1681 (October 9, 1980). Since the rules formed a package, the FAA chose to defer the effective date of the remainder, including the perimeter rule, to the later date. 45 Fed.Reg. 71251 (1980).

On February 27, 1981, the newly-appointed Secretary of Transportation, Drew Lewis, proposed to delay the effective date of the package until October 25, 1981, to enable him thoroughly to reconsider the matter. 46 Fed.Reg. 19225 (1981). On July 8, 1981, he issued a new proposal and regulations which superseded the Goldschmidt policy and regulations. 46 Fed.Reg. 36067

(1981). Although he made some changes, the Secretary approved the 1000-mile perimeter restriction. The DOT promulgated new regulations on November 27, 1981, as part of a coherent operating policy for National and Dulles. 46 Fed.Reg. 58036 (1981).[8]

As if these rules were not enough, the Secretary, on May 8, 1981, ordered the FAA to promulgate a separate, interim perimeter regulation to maintain the existing 650-mile rule in the face of the decision of three airlines to inaugurate nonstop flights to National from Dallas and Houston, Texas. 46 Fed.Reg. 26358. This interim rule, the Secretary declared, met the "emergency" situation created by the airlines' action. It took effect after only one week's comment period instead of the customary 45 or 60 days. 46 Fed.Reg. 28632 (1981).

### The Friendly Skies—Filled with Litigants

The City of Houston filed a petition for review (No. 80–2030) of the Goldschmidt perimeter rule on September 22, 1980. American sought review of both the perimeter and the Goldschmidt slot reallocation rules (No. 80–2251). The Air Transport Association of America and Eastern Airlines filed a petition for review of the slot redistribution rule in Unit B of this Court (now the U.S. Court of Appeals for the Eleventh Circuit). New York Air filed a petition for review of the slot reallocation rule in the D.C. Circuit (No. 81–4004).[9]

---

**7.** In 1968, the FAA, facing increasing delays and congestion at National, dropped the "first come first served" principle and by rule limited flights at National to 60 operations ("slots") per hour. A "slot" simply refers to one aircraft's right to land or take off. Of the 60 slots, 40 had been reserved for certificated air carriers, i.e., the airlines. In the new policy, the DOT proposed to reduce that number to 36 per hour.

**8.** The challenged rule adds a new § 159.60 to Part 159 of the Federal Aviation Regulations (FARs), which reads:

> After January 4, 1981, no person may operate an air carrier aircraft nonstop between Washington National Airport and any airport that is more than 1,000 statute miles away from Washington National Airport.

**9.** The New York Air petition was transferred to this Court on December 11, 1980. By order of January 7, 1981, we consolidated the petitions and subsequently permitted the following parties either to intervene or to file briefs *amicus curiae*: Northwest Airlines, Inc. intervened in Nos. 80–2030 and 80–2251; Virginians for Dulles intervened in Nos. 81–4004, 80–2251 and 80–2030; the Commonwealth of Virginia intervened in Nos. 80–2030, 80–2251 and 81–4004; the County of Prince William, Virginia, intervened in Nos. 80–2030, 80–2251 and 81–4004; U.S. Air, Inc. intervened in No. 81–4194. The City of Birmingham, Alabama filed a brief *amicus curiae* in Nos. 80–2030, 80–2251 and 81–4004; the City of New Orleans, Louisiana filed a brief *amicus curiae* in Nos. 80–2030, 80–2251 and 81–4004; and the State of Louisiana filed a brief *amicus curiae* in Nos. 80–2030, 80–2251 and 80–4004. Then on September 4, 1981, we

The May 8, 1981 interim perimeter rule also spawned litigation. On May 20, 1981, Houston and American moved to enjoin issuance of the interim perimeter regulation. We denied their motions by order filed May 27, 1981. Houston then filed a petition for review of the interim perimeter rule (No. 81–4194), which we consolidated with the petitions seeking review of the final perimeter rule. Only the perimeter rules—interim and final—stand in the dock before us.

### Scope of Review—We're the Administrative Agency, Doing What We Do Best

██ Before we reach cruising altitude, we need, as always, first to delineate the flight plan we must follow. Rulemaking by an administrative agency is governed by the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), which prohibits agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and prescribes proper methods of administrative action. Reviewing courts have taken a radar fix on this amorphous standard on many occasions, but invariably have encountered turbulence during the flight. In general, we review the agency's procedures to ensure reasoned decision-making, but we defer to its expertise in the final analysis. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136, 152 (1971), obliges us "to engage in a substantial inquiry." The agency's decision "is entitled to a presumption of regularity. But that presumption is not to shield [the agency's] action from a thorough, probing, in-depth review." *Id.* We must consider "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.... Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." 401 U.S. at 416, 91 S.Ct. at 823, 28 L.Ed.2d at 153. The record plays a pivotal role, for "the orderly func-

tioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained." *SEC v. Chenery Corporation*, 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626, 636 (1943). Yet we "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transportation v. Arkansas-Best Freight*, 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447, 456 (1974), *citing Colorado Interstate Gas Co. v. FPC*, 324 U.S. 581, 595, 65 S.Ct. 829, 836, 89 L.Ed. 1206, 1219 (1945). As we recently concluded,

> [W]e must accord the agency considerable, but not too much deference; it is entitled to exercise its discretion, but only so far and no further; and its decision need not be ideal or even, perhaps, correct so long as not "arbitrary" or "capricious" and so long as the agency gave at least minimal consideration to the relevant facts as contained in the record.

*American Petroleum Institute v. EPA*, 661 F.2d 340, 349 (5th Cir. 1981).

### You Deserve National Attention?

██ Houston and American label as arbitrary and capricious the FAA's decision administratively to impose a perimeter rule on flights to and from National. We disagree. While the Courts of Appeals have on numerous occasions taken an administrative agency to task for its failure to follow correct procedures or to proffer an acceptable reason for its actions, we find that the FAA and DOT have acted reasonably and in good faith to solve a difficult problem. The agency carefully considered all the factors and arrived at a reasonable judgment. *Overton Park, supra*. In no way do the rules before us constitute arbitrary and capricious agency action. The enormous record in this case bolsters the decision, *see Chenery, supra*, and the arguments of Houston and American, although sincere and not without merit, do not convince us to the contrary.

severed the petitions challenging the perimeter restrictions from those challenging the slot re-

distribution rule.

■ Houston and American contend that no rational basis connects the FAA's goals—to protect Dulles and to preserve the short-haul status of National—to the means it has adopted. This argument ignores reality and, in the process, misreads the factual record. Having traveled through these two airports, we may take judicial notice of their problems of under- and over-use. The FAA's actions, while not the only way of treating these problems, fall well within the APA's radar scope for agency action.

A perimeter rule, Houston and American allege, will not protect Dulles. Moreover, there is no showing that Dulles needs protection. They are wrong on both counts. As counsel for the FAA pointed out at oral argument, one could shoot off a cannon in the Dulles terminal at midday without a chance in the world of hitting anyone. Except for the hours from 4:00 to 8:00 p. m., when the complement of West Coast nonstop and international flights arrive and depart, Dulles is deserted.[10] In those same hours, National is saturated with passengers. Dulles needs help, which the perimeter rule, by preventing the further concentration of flights at National, can provide.

We point out what Houston and American conveniently ignore, that Dulles since 1967 has depended upon a perimeter rule of some sort at National. Already empty for much of the day with a rule, Dulles might, if we invalidate the perimeter, cease to exist. Carriers would schedule nonstop flights from National to Denver, Dallas and Houston. The shift would leave Dulles

with only the California and Seattle non-stops, which employ aircraft that cannot land on National's short runway, and the international trade. That small amount of traffic, contrary to petitioners' predictions, would not prove adequate to sustain the airport. Their zeal for overturning these regulations confirms the FAA's view that "as long as carriers are able to increase the number of passengers carried at National, they will continue to do so." 45 Fed.Reg. at 62399.

Houston and American suggest that since the FAA has imposed a ceiling on the number of flights per day at National, the lifting of the perimeter rule would allow the market to determine the level of service. Even if true, that redistribution would not necessarily serve the public interest. The airlines, having only so many slots at their disposal, would drop service to Podunk in place of the more profitable, longer-haul markets.

> As long as carriers are able to increase the number of passengers carried at National, they will continue to do so. It has been to their advantage to shift longer haul flights formerly scheduled at Dulles to National, at the expense of shorter haul markets traditionally served there.

Metropolitan Washington Airports Policy, Final EIS, August 1980, at 5. That course not only undercuts National's short-haul status, but it reduces the level and quality of service to smaller towns in our nation, which the FAA and CAB are sworn to uphold.

10. The following table depicts the FAA's predictions for the three airports if there is no change in operating policy:

PASSENGER FORECAST
NO POLICY CHANGE

1979 EXISTING

| AIRPORT | AIR CARRIER | AIR TAXI/ COMMUTER | GENERAL AVIATION | TOTAL |
|---|---|---|---|---|
| National | 14,277,825 | 632,578 | 223,614 | 15,134,017 |
| Dulles | 3,311,965 | 26,587 | 124,298 | 3,462,850 |
| Baltimore | 3,771,219 | N/A | 93,214 | 3,864,433 |
| Regional TOTAL | 21,361,009 | 659,165 | 441,126 | 22,461,300 |

1985

| AIRPORT | AIR CARRIER | AIR TAXI/ COMMUTER | GENERAL AVIATION | TOTAL |
|---|---|---|---|---|
| National | 17,872,000 | 792,000 | 225,000 | 18,889,000 |
| Dulles | 4,558,000 | 30,000 | N/F | 4,588,000 |
| Baltimore | 5,525,000 | 287,000 | N/F | 5,812,000 |
| Regional TOTAL | 27,955,000 | 1,109,000 | N/F | 29,064,000 |

1990

| AIRPORT | AIR CARRIER | AIR TAXI/ COMMUTER | GENERAL AVIATION | TOTAL |
|---|---|---|---|---|
| National | 17,971,000 | 1,000,000 | 240,000 | 19,211,000 |
| Dulles | 9,395,000 | 32,000 | N/F | 9,427,000 |
| Baltimore | 8,542,000 | 396,000 | N/F | 8,938,000 |
| Regional TOTAL | 35,908,000 | 1,428,000 | N/F | 37,336,000 |

1995

| AIRPORT | AIR CARRIER | AIR TAXI/ COMMUTER | GENERAL AVIATION | TOTAL |
|---|---|---|---|---|
| National | 19,037,000 | 1,250,000 | 260,000 | 20,547,000 |
| Dulles | 11,727,000 | 42,000 | N/F | 11,769,000 |
| Baltimore | 10,828,000 | 502,000 | N/F | 11,330,000 |
| Regional TOTAL | 41,592,000 | 1,794,000 | N/F | 43,386,000 |

Metropolitan Washington Airports Policy, Final EIS, August 1980, at II 18 (footnotes omitted).

In the same breath, Houston and American retort that the FAA could always increase the number of slots to protect the commuter and short-haul flights. Yet that idea puts us back where we started. The FAA wants to decrease traffic at National, not increase it. For the same reasons that international traffic in New York centers at John F. Kennedy Airport,[11] it makes sense to the FAA that one Washington airport handle the volume of nonstop traffic to the distant cities.

### The Long and Short Haul of It

Next, Houston and American insist that National "has not been, is not and will not be" a short-haul airport. They correctly point out that National serves as many, if not more, of the long-haul cities as does Dulles, *e.g.*, San Francisco, Los Angeles, Seattle, Portland, Las Vegas, Denver. *See* Official Airline Guide, North American Edition (June 1, 1982). Yet their argument ignores the very point at issue. Those flights *must stop* somewhere less than 1000 miles from National. No one has ever attempted completely to bar travelers from distant cities from flying to National Airport. Such an attempt might well give rise to a constitutional claim. Rather, the perimeter rule gives travelers a choice. Those who prefer nonstop service may use Dulles; those who do not mind a stopover in Chicago, Atlanta, St. Louis, Memphis, Pittsburgh, New Orleans, or Charlotte, may take a slightly lengthier trip and arrive at or depart from National. Whether they simply stop over or must change planes, the passengers who elect that alternative do leave from or arrive at National on a short-haul flight. The ultimate destination on the ticket cannot change that fact.

The rule comports with common sense. We propose the following example by way of illustration. A New Yorker with business in Washington will make the 53-minute flight in the morning, have a full day to transact his business, and still return home by evening.[12] He carries with him nothing but a briefcase. By contrast, a business traveler from Houston who leaves at 7:00 a. m. does not arrive in the Washington area until 11:48 a. m.[13] If he seeks to return home the same day, he has only the afternoon in which to complete his affairs. If, as seems more likely, he plans to stay overnight, he will carry baggage. Such luggage-laden travelers are precisely those who make National congested. They have less need of National's convenience to downtown than the one-day, arrive-and-return traveler whom we have described. The FAA's determination to reserve National for the short-haul passenger finds ample support in the practicalities of air travel.

### A Modest Alternative

Houston generously proposes an alternative perimeter rule. Acting, apparently, on the theory that a perimeter rule is arbitrary, capricious, irrational, and unconstitutional if it excludes Houston but hunkydory if not, Houston suggests that the FAA promulgate a 1500-mile rule. That distance coincides with the approximate range of those jets currently serving National and, curiously enough, embraces Houston.

11. While JFK Airport does not, as petitioners correctly point out, handle *all* of the international traffic in New York, it is a fair statement to say that the airport handles the vast majority of such flights. *See* Official Airline Guide, International Edition (June 1, 1982).

12. The New York passenger would catch the 7:00 a. m. Eastern Airlines Air-Shuttle, leaving LaGuardia Airport at 7:00 a. m. and arriving at National at 7:53. Leaving Washington that evening, he might catch the 7:00 p. m. Eastern Air-Shuttle which arrives back in New York at 8:00 p. m. *See* Official Airline Guide, North American Edition (June 1, 1982).

13. Assuming for present purposes that the flight time to the Washington metropolitan airports is approximately the same, we take note that the Houston traveler could leave Houston at 7:00 a. m. and arrive in Washington at 11:48 a. m. nonstop. At the end of his shortened business day, he could catch at 6:40 p. m. flight from Washington which would return him to Houston, exhausted, at 10:38 p. m. *See* Official Airline Guide, North American Edition (June 1, 1982).

The FAA could have selected such a perimeter, just as it could have continued the status quo or closed National altogether, but it chose not to do so. As it conceded, "The resultant policy is not likely to be acceptable to all factions, but it represents the [DOT's] views of the proper role and best use of these two airports in the public interest." Metropolitan Washington Airports Policy, Supplement to Final EIS, September 1981, at II–11. Ours is not to reason why, ours is but to uphold the agency's decision if not arbitrary and capricious. *Overton Park, supra.* Houston's suggestion finds even less support in logic or tradition than the FAA's rule. While the 1000-mile rule at least possesses the virtue of continuity, the Houston proposal would bind National, a few years down the runway, to the traveling range of outdated aircraft. One might as well limit the perimeter to the range of the Wright Flyer.[14]

The FAA has produced copious reasons for its choice. The various drafts of the EIS run several hundred pages, accompanied by exhibits and tables covering every possible alternative for National and Dulles. The EIS points to the problems that currently plague National—overcrowded parking lots and aircraft aprons, insufficient counterspace, traffic congestion, too little baggage claim area, harsh environmental effects on the airport's neighbors—and convincingly shows that, in the absence of a perimeter rule, National would absorb long-distance flights over and above its already overcrowded capacity, while Dulles would wither on the vine. The agency defends its choice of a 1000-mile perimeter on the basis that it preserves the status quo but relieves the inequity that the 650-mile rule with its exceptions created.[15]

As Justice Holmes once remarked,

When a legal distinction is determined, as no one doubts that it may be, between night and day, childhood and maturity, or any other extremes, a point has to be fixed or a line has to be drawn, or gradually picked out by successive decisions, to mark where the change takes place. Looked at by itself, without regard to the necessity behind it, the line or point seems arbitrary. It might as well, or nearly as well, be a little more to one side or the other. But when it is seen that a line or point there must be, and that there is no mathematical or logical way of fixing it precisely, the decision of the legislature must be accepted unless we can say that it is very wide of any reasonable mark.

*Louisville Gas & Electric Co. v. Coleman,* 277 U.S. 32, 41, 48 S.Ct. 423, 426, 72 L.Ed. 770, 775 (1928) (Holmes, J., dissenting). The FAA's line is not "very wide of any reasonable mark." Our "thorough, probing, in-depth review", *Overton Park, supra,* obliges us to uphold the FAA's decision.

### Who's In Charge Here?

Even if it did not act arbitrarily and capriciously, the FAA, say American and Houston, lacked the statutory authority to impose a perimeter restriction. That argument fails to make it off the ground. The Federal Aviation Act and the FAA's status as proprietor of National and Dulles provide independent support for its decision.

Curiously enough, the FAA has never grounded its decision on safety concerns.[16] Rather, it asserts its rights as the proprietor

---

14. The plane constructed by the Wright brothers which opened American aviation history at Kitty Hawk, North Carolina, on December 17, 1903. For the aviation history buff, we point out that Orville Wright piloted the plane, which weighed 744 pounds, on its famous voyage. The Wright Flyer was launched from a monorail "runway", not unlike modern planes, stayed in the air a rather modest 59 seconds, and flew on its longest journey a total of 852 feet—a short perimeter, indeed.

15. For example, because Minneapolis/St. Paul was grandfathered in the 1966 voluntary agreement, it had nonstop access to National while Birmingham, Alabama, several hundred miles closer, did not.

16. Like all newspaper readers and television news watchers, we must be aware of the tragic plane crash at National on Wednesday, January 13, 1982, which obviously raises serious safety factors.

of the two airports. Analogizing to the right of a store owner to run his business, FAA acted to manage, as best it could, the great and increasing volume of air traffic in the Washington area.[17]

At the outset, we dispense with the claim that § 105 of the Federal Aviation Act, 49 U.S.C. § 1301 *et seq.*, bars the FAA from taking the actions it did. Section 105 of the Act, 49 U.S.C. § 1305, entitled Federal preemption, delineates the powers of airport proprietors. It reserves for the federal authorities control over "rates, routes or services of any [interstate] air carrier." Yet the statute also specifies that it deals with "the authority of any State or political subdivision thereof or any interstate agency or other political agency of two or more States as the owner or operator of an airport." The FAA does not fit within that definition. Nothing could be more certain than that the restrictions of § 1305 do not bind the FAA, an arm of the federal government which just happens to own two airports.

While it is true that "Congress had reserved [an] extremely limited role ... for airport proprietors in our system of aviation management," *British Airways Board v. Port Authority of New York and New Jersey,* 564 F.2d 1002, 1010 (2nd Cir. 1977), the FAA is not the typical airport proprietor. Why did Congress specify such a limited role? To avoid interference with the preeminent authority of the federal government in the field of aviation, Congress, in § 1305, sought to prevent the proprietor of a rural airstrip from infringing upon the federal government's turf. FAA obviously plays a different role. Houston and American claim, in effect, that the FAA may not take certain actions for fear of interfering with itself. The argument reduces to tautological gibberish.

Houston and American call attention to the FAA's actions in seeking an injunction against the John Wayne Airport (JWA) in Orange County, California. JWA imposed a perimeter on flights from more than 500 miles away. The FAA intervened, arguing that the airport exceeded its proprietary authority. The District Court agreed and granted the injunction. *Pacific Southwest Airlines v. County of Orange,* No. CV 81–3248 (C.D.Cal. Nov. 30, 1981).

The JWA affair does not undercut the FAA's actions. A local airport with no connection to nearby Los Angeles International or Ontario Airports, JWA could not blithely take such an action upon itself. Section 1305 removes control over routes, etc., from local airport proprietors. Petitioners again miss the key question, that is, whether the FAA is governed by the same rules as a local proprietor. The answer, obviously, is no.

Even if proprietary interest cannot legitimate its decision, the Federal Aviation Act grants the FAA the power to impose a perimeter. Section 1303 provides:

In the exercise and performance of his powers and duties under this Act the [Secretary of Transportation] shall consider the following, among other things, as being in the public interest:

 \* \* \* \* \* \*

(c) The control of the use of the navigable airspace of the United States and the *regulation of* both *civil* and military *operations* in such airspace *in the interest* of the safety *and efficiency* of both.

Section 1348(a) of the Act states:

The [Secretary] is authorized and directed *to develop plans for and formulate policy* with respect to the *use of the navigable airspace*; and assign by rule, regulation, or order the use of the navigable airspace under such terms, conditions, and limitations as he may deem necessary in order to insure the safety of aircraft and the *efficient utilization of such airspace.*

In a similar vein, § 1353(a) declares:

The [Secretary] is directed to make long range plans for and formulate policy with respect to the *orderly development and use* of the navigable airspace, *and the*

---

17. *Dallas v. Southwest Airlines Co.,* 494 F.2d 773 (5th Cir. 1974), on which petitioners rely, involved intrastate aviation and has less than no bearing on our case.

*orderly development and location of landing areas. . . .*

To top it off, § 1354(a) provides:

The [Secretary] is empowered to perform such acts, to conduct such investigations, to issue and amend such general or special rules, regulations, and procedures, pursuant to and consistent with the provisions of this Act, as he shall deem necessary to carry out the provisions of, and to exercise and perform his powers and duties under, this Act.

The terms of the Act clothe the FAA with authority to formulate policy for the efficient use of navigable airspace and landing areas. Without engaging in a word by word definition of those terms, we find these sections support the FAA's actions. Section 1354(a), finally, grants the Secretary the power to effectuate such policies.

We cannot, consistent with common sense, read these sections in any other way. The navigable airspace is of surprisingly little use if a plane cannot land or take off. To promote its "efficient utilization", the FAA must have the power to make rules and regulations governing not only the corridors of air traffic, but the use of airports as well. The perimeter rules help to accomplish that goal in the Washington area: by setting up an orderly plan for the development of National and Dulles, they aid in the efficient use of now-crowded airspace.

Houston and American refer us to provisions of the D.C. Code which govern such critical aspects of airport operation as the lost and found desk or water fountains. They cannot seriously contend that such powers, although important in their own way, constitute the outer limits of an airport proprietor's authority. The Federal Aviation Act is our handbook, and it ordains that the FAA may take whatever steps it considers necessary to carry out its statutory responsibilities.

Houston suggests that in the absence of statutory authority, the perimeter rule requires an "explicit grant of authority by Congress". We have already found that the Federal Aviation Act authorizes the rule. Even if the Act did not reach so far, however, Congress has stepped into the breach. In the Department of Transportation and Related Agencies Appropriations Act, *supra*, Congress froze the number of air carrier operations at National. The legislative record makes clear that Congress did *not* intend to hold up any of the other aspects of the Metropolitan Washington Airports Policy. Congressman Duncan, the Chairman of the House Committee, stated,

In delaying the reduction of hourly slots, it was not our intention to disapprove or negate the overall Washington National Airport policy or to delay the balance of the plan. . . . It is not the intent of the conferees to interfere with whatever ultimate responsibility and authority the FAA may have for the orderly management of traffic at Washington National Airport. . . ."

126 Cong.Rec.H 10049 (daily ed. Sept. 30, 1980) (statement of Rep. Duncan).

The Senate Report on the bill confers that body's blessing as well. It states:

The Committee is pleased to see the FAA adopt a final metropolitan Washington airports policy regarding the operations of Washington National and Dulles International Airports. The Committee has raised no objections to the proposed changes in operating procedures at Washington National. . . . The Committee expects prompt implementation of this policy through the issuance of appropriate Federal regulations.

An obvious imbalance exists in the utilization of the three major airports serving the Baltimore-Washington metropolitan area. While on the one hand we have a gross underutilization of two large international airports, we find that on the other hand, National Airport absorbs approximately as much traffic as the other two combined. Although it is difficult to achieve a balance in addressing this problem, the Committee feels that *the FAA's recent announcement of a metropolitan Washington airports policy is a step in the right direction.*

S.Rep.No.96–932, 96th Cong., 2d Sess. 27 (1980) (emphasis added).

Congress, whose members frequent the Washington area airports, knew of the FAA's actions in restricting service at National. These excerpts from the legislative record demonstrate that Congress in effect ratified that policy. "[A] consistent administrative interpretation of a statute, shown clearly to have been brought to the attention of Congress and not changed by it, is almost conclusive evidence that the interpretation has Congressional approval." *Kay v. FCC*, 443 F.2d 638, 646–47 (D.C.Cir. 1970) (FCC action). Thus even if the FAA's action necessitated Congressional support, which it did not, Congress concurred in the agency's decision.

### Authority, Authority, Who's Got the Authority?

In a last gasp objection, American and Houston protest that the CAB rather than the FAA bears the responsibility for economic regulation of aviation. *See, e.g., Delta Air Lines v. CAB*, 543 F.2d 247, 259 (D.C.Cir.1976). Obviously they have not read the newspapers. For all intents and purposes, the CAB has folded its wings and gone into retirement. The Airline Deregulation Act of 1978 mandated a significant reduction in the governmental regulation of the airlines, and the CAB obediently has committed regulatory suicide. Surely someone must have the responsibility for National and Dulles airport. The CAB had it, but it has lost it. *See* House Committee on Public Works & Transportation, Legislative History of the Airline Deregulation Act of 1978 (Comm.Print 1978). With the CAB off the radar scope, only the FAA—under the terms of the Federal Aviation Act—can assume such responsibility.

 We find that the FAA, acting in its proprietary capacity as the owner/operator of National and Dulles, had express authority under the Federal Aviation Act to promulgate reasonable regulations concerning the efficient use of the navigable airspace. The perimeter rule falls within

its grasp as a means of promoting such efficiency. Since we have held, *supra*, that the rule does not violate the APA, it follows that we must deny the petitions for review.

### First Port in a Storm

We turn, at last, to the constitutional claim which Houston and American raise. They argue that the FAA's perimeter rule violates the Port Preference Clause, Article I, Section 9, Clause 6, which reads:

> No preference shall be given by any Regulation of Commerce or Revenue to the Ports of one State over those of another: nor shall Vessels bound to, or from, one State, be obliged to enter, clear or pay Duties to another.

By allowing only those airports within 1000 miles the privilege of nonstop flights to National, the FAA has, Houston and American assert, granted such a preference to some states.[18]

This argument, although facially attractive, will not fly. The clause may not be "a fossilized remainder of an age of American federalism that has long since passed", but neither is it, in airline terminology, overbooked. Decisions interpreting the clause are so few and far between that we must harken back to 1856—long before Wilbur and Orville Wright dreamed of defying gravity—to find the "authoritative" case.

*Pennsylvania v. Wheeling and Belmont Bridge Co.*, 59 U.S. (18 How.) 421, 15 L.Ed. 435 (1856), involved a challenge to the construction of a bridge over the Ohio River near Wheeling, West Virginia. The bridge was low enough that it blocked some paddle vessels from proceeding up the river to the port of Pittsburgh. Pennsylvania sought modification or demolition of the bridge. Replying to its argument that the explicit approval of construction by Congress violated the Port Preference Clause, Justice Nelson declared:

> There are many Acts of Congress passed in the exercise of this power to regulate

---

**18.** The government concedes that "Port" should not be read in its nautical sense only but extends to an airport as well.

commerce, providing for a special advantage to the port or ports of one state and which very advantage may incidentally operate to the prejudice of ports in a neighboring state, which have never been supposed to conflict with this limitation upon its power. . . . It will not do to say that the exercise of an admitted power of Congress conferred by the Constitution is to be withheld, if it appears, or can be shown, that the effect and operation of the law *may incidentally extend beyond the limitation of the power.* Upon any such interpretation, the principal object of the framers of the instrument in conferring the power would be sacrificed to the subordinate consequences resulting from its exercise. . . . [A]s to a preference by a regulation of commerce, the history of the provision, as well as its language, looks to a prohibition against granting privileges or immunities to vessels entering or clearing from the ports of one state over those of another. . . . Thus much is undoubtedly embraced in the prohibition; and it may, certainly, also embrace any other description of legislation looking to a *direct privilege or preference* of the ports of any particular state over those of another. Indeed, the clause, in terms, seems to import a prohibition against *some positive legislation* by Congress to this effect, and *not against any incidental advantages that might possibly result* from the legislation of Congress upon other subjects connected with commerce, and confessedly within its powers. . . . The truth seems to be, that what is forbidden is, not discrimination between individual ports within the same or different states, but discrimination between states; and if so, in order to bring this case within the prohibition, it is necessary to show, not merely discrimination between Pittsburgh and Wheeling, but discrimination between the ports of Virginia and those of Pennsylvania.

59 U.S. at 433–35, 15 L.Ed. at 438–39 (emphasis added). *See also Bailey Farm Dairy Co. v. Anderson,* 157 F.2d 87 (8th Cir.), *cert. denied,* 329 U.S. 788, 67 S.Ct. 355, 91 L.Ed. 675 (1946).

Twenty years later, the Supreme Court turned again to the Port Preference Clause in *South Carolina v. Georgia,* 93 U.S. 4, 23 L.Ed. 782 (1876). The United States dredged the southern channel of the Savannah River around Hutchinson's Island to improve navigation. The dredging obstructed the northern circuit around the island. South Carolina sued, claiming that this action marked a preference for Georgia ports over those of South Carolina. Justice Strong dispensed with the argument in record time. Citing *Wheeling Bridge,* he observed, "the prohibition of such a preference does not extend to Acts which may directly benefit the ports of one State and only *incidentally* injuriously affect those of another." 93 U.S. at 13, 23 L.Ed. at 784 (emphasis added).

Finally, in *Alabama Great Southern Railroad Co. v. United States,* 340 U.S. 216, 71 S.Ct. 264, 95 L.Ed. 225 (1951), the Court, facing a challenge to an Interstate Commerce Commission order that allegedly gave a preference to the port of New Orleans over ports in other states, held that the Port Preference Clause did not apply: "And we are clear that whatever preference there is to New Orleans is a result of geography and not of any action of the Commission." 340 U.S. at 229, 71 S.Ct. at 273, 95 L.Ed. at 238.

■ Mere age does not weaken the strength of an opinion. Nor, obviously, can it reduce the scope of constitutional protection. Yet without slighting the Port Preference Clause, we believe that the Supreme Court, in these cases construing it, has sketched for us the appropriate inquiry. Government actions do not violate the Clause even if they result in some detriment to the port of a state, where they occur (i) as an incident to some otherwise legitimate government act regulating commerce or (ii) more as a result of the accident of geography than from an intentional government preference.

■ With these considerations in mind, we have no difficulty in concluding that the FAA's actions do not violate the Clause. Government actions in our society touch

upon or regulate matters that the Framers could not have envisioned in their wildest dreams. As Justice Stone once observed,

> We may assume that the Framers of the Constitution, in adopting [Article I, Section Four] did not have specifically in mind the selection and elimination of candidates for Congress by the direct primary any more than they contemplated the application of the commerce clause to interstate telephone, telegraph and wireless communication.

*United States v. Classic,* 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941) (different context). Nor can we assume that the Framers would not have wanted to guarantee Congressional neutrality in the selection and administration of airports. In instances of technology overtaking the constitutional text, we must ascertain the concerns that prompted the Framers to act as well as their intent in drafting the specific language.

The history of the Clause demonstrates its inapplicability. Maryland delegates, who feared that Congress might require ships in Chesapeake Bay to put in at Norfolk or some other Virginia port, proposed a clause as a safeguard against Virginia's great strength in Congress. *See* 59 U.S. at 434, 15 L.Ed. at 438. The Port Preference Clause gave small states protection against deliberate discrimination against them by other, more powerful states. It does not, we believe, cover the situation before us, where the FAA has adopted what another realm of constitutional law would term a facially neutral rule.

The accident of geography, not any deliberate discrimination against the western states, underlies the FAA's rule. The perimeter does not discriminate against a named state or states. It does not declare that Texans may not fly nonstop to National. Rather, it sets a limit of 1000 miles on nonstop flights. Some states, e.g. Louisiana, straddle the line. Some Louisiana airports meet the requirement, others do not. Just as the Rocky Mountain states possess beautiful scenery, Texas its reservoirs of oil and natural gas, and California its sandy beaches, so the accident of geography places some states within 1000 miles of National

and others beyond. The perimeter rule, which for geographic reasons has an incidental effect on air travel from certain states, does not thereby violate the Constitution.

### Have Perimeter Rule, Will Travel

█ Houston and American finally make the unlikely contention that the perimeter rule violates passengers' constitutional right to travel. While one could search forever for a clause explicitly conferring such a right and never discover one, the Supreme Court, in *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), did find such a guarantee. The Justices struck down a residency requirement for welfare recipients on the ground that it violated the constitutional right to travel freely from state to state.

> [T]he purpose of inhibiting migration by needy persons into the state is constitutionally impermissible. This Court long ago recognized that the nature of our Federal Union and our constitutional concepts of personal liberty unite to require that all citizens be free to travel throughout the length and breadth of our land uninhibited by statutes, rules or regulations which unreasonably burden or restrict this movement.

394 U.S. at 629, 89 S.Ct. at 1328, 22 L.Ed.2d at 612. Justice Brennan's opinion rested on the right of poor persons to migrate to another state in search of a better life. Residency requirements that might hinder such movement could not survive constitutional challenge. We have here no such claim. Neither Houston nor American suggests, nor could they, that the perimeter rule operates as a residency requirement to deny persons their constitutional right to travel. At most, their argument reduces to the feeble claim that passengers have a constitutional right to the most convenient form of travel. That notion, as any experienced traveler can attest, finds no support whatsoever in *Shapiro* or in the airlines' own schedules.

### Final Approach

As we line up for our final approach, we glance back over the route we have taken.

The FAA's perimeter rule for National Airport, we hold, rests on an adequate factual and statutory basis and does not violate the terms of the APA. We uphold the agency's actions and deny the petitions for review.

Since we uphold the 1000-mile perimeter rule, the interim 650-mile rule with its exceptions is null.[19] We must, then, dismiss the challenge to the interim rule. Only a "live" controversy can satisfy the Article III requirements governing adjudication in the federal courts. *Weinstein v. Bradford*, 423 U.S. 147, 148–49, 96 S.Ct. 347, 348, 46 L.Ed.2d 350, 352 (1975). *See also Flast v. Cohen*, 392 U.S. 83, 95, 88 S.Ct. 1942, 1950, 20 L.Ed.2d 947, 959 (1968); *Zeidman v. J. Ray McDermott & Co., Inc.*, 651 F.2d 1030, 1041–42 (5th Cir. 1981). When an administrative order lapses by its own terms, as here, a challenge to that order is moot. *Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310, 316 (1911); *Tennessee Gas Pipeline Co. v. FPC*, 606 F.2d 1373, 1381 (D.C. Cir.1979).

NOS. 80–2030, 80–2251, PETITIONS DENIED; NO. 81–4194, DISMISSED.

___

**19.** The interim rule by its terms expired on October 25, 1981. Responding to the FAA's suggestion of mootness, Houston and American asserted that if this court held the final rule invalid, then the FAA might revive the interim rule. Our conclusions in Nos. 80–2030 and 81–2251 also dispose of this point.