**CITY OF MILWAUKEE, WISCONSIN, et al., Plaintiffs,**

**v.**

**John R. BLOCK, in his official capacity as Secretary of the United States Department of Agriculture and as Chairman of the USDA Commodity Credit Corporation, et al., Defendants,**

**and**

**Transportation Institute, et al., Defendants–Intervenors.**

**No. 85–C–1509.**

United States District Court, E.D. Wisconsin.

June 15, 1988.

Grant F. Langley, City of Milwaukee, City Atty., Milwaukee, Wis., Robert E. Jensen, George D. Baker, Williams and Jensen, P.C., Washington, D.C., for plaintiffs.

Ann M. Kisting, Asst. U.S. Atty., Milwaukee, Wis., Dennis G. Linder, Dina R. Lassow, U.S. Dept. of Justice, Civil Div., Washington, D.C., for defendants.

Jonathan Blank, Kathryn P. Broderick, Preston, Thorgrimson, Ellis & Holman, Washington, D.C., for defendants-intervenors.

## DECISION AND ORDER

WARREN, Chief Judge.

The Cargo Preference Act of 1954, 46 U.S.C.App. § 1241(b), (1970, West Supp. 1987), and its 1985 amendment, 46 U.S.C. § 1241f, require that whenever the federal government contracts to purchase and transport agricultural commodities to overseas nations, the federal agencies involved are to make certain that up to 75 percent of the commodities will be transported "on privately owned United States-flag commercial vessels, to the extent such vessels are available at fair and reasonable rates for United States-flag commercial vessels, in such manner as will insure a fair and reasonable participation of United States-flag commercial vessels in such cargos by geographic areas...." The Act has potentially grave ramifications for the Great Lakes shipping industry since, with rare exceptions, United States-flag commercial vessels do not serve the Great Lakes. The case now before the Court involves a statutory and constitutional challenge to the application of the Act to Title II of the Agricultural Trade Development and Assistance Act of 1954, 7 U.S.C. §§ 1721–1726b (also called "P.L. 480"). In particular, the dispute centers on the meaning and application of the Cargo Preference Act's "available" phrase (also called the "Availability Clause"). Plaintiffs, representing various Great Lakes shipping interests, contend that the term exempts the application of the Act from the individual ports of the Great Lakes since no United States-flag ships are available. Defendants (officials of various federal government agencies) and defendant intervenors (representing United States-flag interests) oppose such an interpretation and seek to uphold the current application of the Act to Title II shipments. That current application considers availability on a national basis and

makes no exception for Great Lakes shipping.

Based on the decision below, the Court finds that the plain language of the Cargo Preference Act does not require that the Availability Clause be applied on a nationwide or port-by-port basis; rather, the Act requires availability to be considered by "geographic areas."

## BACKGROUND [1]

### I. *The Parties*

The eighteen plaintiffs in this action include four operators of Great Lakes ports; six labor unions representing longshoremen working the harbor facilities of various Great Lakes ports; four stevedoring service and terminal operation companies servicing Great Lakes ports; one trade association representing various Great Lakes shipping interests; and two foreign-flag shippers and their agent.

The nine government defendants are officials of various federal agencies responsible for administering the provisions of Title II at issue here. They are sued in their official capacities.

The five defendant-intervenors consist of four companies operating United States-flag vessels or organizations with member companies operating United States-flag vessels, and one labor union representing seamen working aboard United States-flag vessels engaged in the United States foreign and domestic shipping trade.

### II. *Statutory and Regulatory Background*

#### A. The Cargo Preference Act

The Cargo Preference Act was enacted to foster and preserve a strong United States merchant marine by aiding the United States-flag operators in their competition with lower cost foreign-flag vessels.[2] H.R.Rep. No. 2329.83 Cong., 2d Sess. 1 (1954), U.S.Code Cong. & Admin.News, 1954 p. 3173. The Act seeks to achieve this purpose by requiring as follows:

Whenever the United States shall procure, contract for, or otherwise obtain for its own account, or shall furnish to or for the account of any foreign nation without provision for reimbursement, any ... commodities, within or without the United States, or shall advance funds or credits or guarantee the convertibility of foreign currencies in connection with the furnishing of such ... commodities, the appropriate agencies shall take such steps as may be necessary and practicable to assure that at least 50 percentum of the gross tonnage of such ... commodities ... which may be transported on ocean vessels shall be transported on privately owned United States-flag commercial vessels, to the extent such vessels are available at fair and reasonable rates for United States-flag commercial vessels, in such manner as will insure a fair and reasonable participation of United States-flag commercial vessels in such cargoes by geographic areas....

46 U.S.C.App. § 1241(b)(1).

The Cargo Preference Act remained substantially unchanged for 30 years following its enactment until December 23, 1985—seven weeks after this lawsuit's commencement—when the President of the United States signed legislation, formally known as the "Food Security Act of 1985", amending the Cargo Preference Act. Pub.L. 99–198 (1985). Four provisions in this legislation pertained to this litigation. Specifically, in summarized fashion, these four provisions were as follows:

i) The U.S.-flag participation goal for donated agricultural commodities is increased from 50 to 75 percent. The increase is to be phased in over a period of three years. Sec. 901b(a)(2).

ii) The required level of U.S.-flag participation must be achieved in each 12-month period beginning April 1, 1986. Thus, the compliance year now begins when the Great Lakes' shipping season

---

1. Much of this Background was previously set forth by the Court in its *Decision and Order* dated April 30, 1986. That decision is reprinted at 634 F.Supp. 760.

2. United States-flag ships are vessels documented in the United States and owned by United States citizens or entities. 46 U.S.C.App. section 1202.

begins. Sec. 901b(c)(2)(A); Complaint ¶ 59.

iii) The Secretary of Transportation is required, during the period 1986–1989, to take "such steps as may be necessary and practicable without detriment to any port range" to preserve the percentage share or metric tonnage of donated commodities exported from Great Lakes ports in 1984. Sec. 901b(c)(2)(B).

iv) Congress has established a detailed scheme for financing the increased ocean freight charges which may result from the increased utilization of relatively expensive U.S.-flag vessels mandated by the Cargo Preference Act. Sec. 901b(d)-(f).

Title XI, Subtitle C of Pub.L. 99–198 (1985) ("The 1985 Amendments").

### B. Title II, P.L. 480

Title II, P.L. 480 embodies a foreign food donation program by which the United States donates agricultural commodities overseas to curb famine, combat malnutrition, and promote economic and community development in friendly developing countries. *See* 7 U.S.C. § 1721(a). The President of the United States is authorized to carry out the Title II, P.L. 480 program. *Id.* Section 1–201 of Executive Order 12220 delegates the Title II, P.L. 480 functions vested in the President to the Director of the United States International Development Cooperation Agency ("IDCA"). 45 Fed.Reg. 44245 (June 27, 1980). The IDCA has internally redelegated these functions to the Agency for International Development ("AID") who, in conjunction with the Commodity Credit Corporation ("CCC"), administers the Title II, P.L. 480 program. In the Title II, P.L. 480 program, the CCC provides requested commodities for donation and pays the costs of acquiring, processing, packaging and transporting the donated commodities from the commodity supplier's plant to the foreign destination. 7 U.S.C. §§ 1721(a), 1723. The Cargo Preference Act applies to the Title II, P.L. 480 program.

### C. CCC Original Procurement and Port Allocation Regulation

The CCC's original procedure used in procuring and allocating to ports the Title II, P.L. 480 commodities was published at 7 C.F.R. Part 1496. These regulations provided that, as a general principle, contracts for the procurement and allocation to ports be awarded on the basis of "lowest landed cost." 7 C.F.R. § 1496.5(a). "Lowest landed cost" was defined as the lowest combined total cost of acquiring the commodities and transporting them to the port of export, plus shipping them across the ocean to the discharge port. 7 C.F.R. § 1496.3(g). However, the following "additional factors" were to be considered in awarding contracts: the availability of ocean service, the adequacy of ocean service, port performance, and transit time.

### D. The Challenged Cargo Diversions

The underpinnings of this litigation stem from the decision of companies operating United States-flag vessels not to service the Great Lakes ports. Consequently, most shipments from Great Lakes ports are transported on foreign-flag vessels.

In August and September of 1985, because of circumstances depressing the overall United States-flag participation rate in the Title II program, Title II, P.L. 480 cargo destined to Great Lakes ports pursuant to the lowest landed cost formula was diverted by the CCC to coastal ranges serviced by United States-flag vessels. The basic problem requiring such diversion was United States-flag unavailability to Title II destinations, aggravated by increased Title II, P.L. 480 shipments to Africa—a destination serviced only to a limited extent by United States-flag vessels—for famine relief.

Two different diversion techniques were employed. First, commodities were purchased outside of the Midwest, at costs higher than lowest landed cost, putting the commodities in a position for United States-flag transport at ports other than Great Lakes ports. Second, commodities purchased in the Midwest were shipped by rail to ports frequented by United States-flag vessels.

III. *Procedural History and New CCC Regulations*

Plaintiffs commenced this action on October 28, 1985, seeking declaratory judgment and injunctive relief against the government defendants' allegedly unlawful and unconstitutional interpretation and application of the Cargo Preference Act. Plaintiffs also alleged that the government defendants failed to follow their own regulations, rules and policies governing the Act's application to Title II. In a *Decision and Order* dated April 30, 1986, (reprinted at 634 F.Supp. 760), the Court dismissed plaintiffs' action for lack of standing.

Plaintiffs appealed. On February 25, 1987, while the case was under consideration by the United States Court of Appeals for the Seventh Circuit, the CCC promulgated new regulations for the operation of the Title II program.

Under these regulations, the CCC will continue to award shipping contracts using the lowest landed cost method. However, the CCC will now divide the bidding process into two steps. In the first step, the CCC will calculate the lowest landed cost using only higher-priced United States-flag ship rates for the portion of its commodities that it believes is necessary to meet its obligations under the Cargo Preference Act on a nationwide basis. *See* 52 Fed.Reg. 5726 (Feb. 25, 1987) (amending 7 C.F.R. section 1496.5(a)). In the second step, foreign-flag ships will be able to compete with United States-flag ships for the remaining cargo. Because no United States-flag ships serve the Great Lakes region, no cargo will be assigned to the Great Lakes ports in the first stage of the process. As a result, there will be no future diversions of Title II cargo which would otherwise go to the Great Lakes ports.[3]

In *City of Milwaukee v. Block*, 823 F.2d 1158 (1987), the United States Court of Appeals for the Seventh Circuit reversed the dismissal and remanded the case for further proceedings. The appellate court ruled (1) that plaintiffs' claim that the government defendants failed to comply with the previous CCC regulations was moot in light of the new CCC regulations; (2) the statutory and constitutional challenges to the application of the Availability Clause of the Cargo Preference Act were not moot in light of the new regulations; and (3) based on the recent Supreme Court case of *Clarke v. Securities Industry Association*, 479 U.S. 388, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987), plaintiffs had standing to bring their statutory and constitutional challenges.

In determining that the case was not moot in all respects, the appellate court held as follows:

We also conclude, however, that plaintiffs' claim that the defendants have misinterpreted the Cargo Preference Act, and their claim that the defendants' interpretation of the Act is unconstitutional, are not moot. The maritime defendants correctly observe that the plaintiffs have framed much of their complaint in terms of the CCC's diversions of cargo. However, the plaintiffs' complaint is not limited to this issue. The central issue in this dispute is the interpretation of the Cargo Preference Act. The defendants believe that the minimum United States-flag vessel percentage mandated by the Act must be achieved on a nationwide basis. The plaintiffs argue that this view violates both the Act and the Constitution. They contend that, under the Availability Clause, the Cargo Preference Act minimum does not apply at any port that is not served by United States-flag vessels.

The new CCC regulations have not altered the defendants' interpretation of the Cargo Preference Act. On the contrary, the first step of the new regulations requires the CCC to allocate a sufficient amount of cargo to United States-flag vessels to meet the Cargo Preference Act minimum on a nationwide basis. The result is that the CCC continues to ship less cargo through the Great Lakes

---

**3.** *City of Milwaukee v. Block*, 823 F.2d 1158, 1162 (1987).

ports than it would if it had adopted the plaintiffs' interpretation of the Act.

823 F.2d at 1164.

After remand, the Court held a status conference at which the parties agreed to file summary briefs on the issues left open by the appellate court. That briefing has since been completed.

## ISSUES PRESENTED

The issues presented to this Court by the Seventh Circuit remand are: (1) whether the application of the Availability Clause on a nationwide basis for Title II purposes violates the Cargo Preference Act; and (2) whether that application violates the Port Preference Clause of the United States Constitution.[4]

## DISCUSSION

I. *Interpretation of the Cargo Preference Act*

    A. Positions of the Parties

        1. *Plaintiffs*

Plaintiffs contend that the Availability Clause of the Port Preference Act exempts the Great Lakes from the mandated percentages by virtue of the fact that no United States-flag ships serve the Great Lakes. In their brief after remand, plaintiffs sup-

port this construction from three perspectives: (a) the Seventh Circuit decision reversing this Court's ruling on standing; (b) the legislative history of the Cargo Preference Act; and (c) the administrative history of the Act.

Under the first point, the plaintiffs cite to the following language of the Seventh Circuit decision:

The legislative history of the Cargo Preference Act makes clear that Congress' primary concern was to protect the American merchant marine. However, the legislative history also indicates that, in enacting the Cargo Preference Act, Congress shared the plaintiffs' concern about the effect of the legislation in situations in which no United States-flag ships are available. *See, e.g.,* S.Rep. No. 1584, 83 Cong. 2d Sess. 2 (1954); *Waterborne Cargoes in United States Flag Vessels: Hearings on S.3233 Before the House Comm. on Merchant Marine and Fisheries,* 83 Cong., 2d Sess. at 14 (1954) (remarks of Rep. Ray); *id.* at 94 (statement of Acting Chairman Tollefson); *id.* at 122–123 (remarks of Rep. Allen). Moreover, Congress specifically demonstrated its concern regarding the effect of the Cargo Preference Act on the Great Lakes Program when it enacted the 1985 amendments. *See, e.g.,* 131

---

**4.** The government defendants, in a footnote in their brief after remand, argue that another issue still in dispute is whether this Court can grant the injunctive relief sought by plaintiffs. The government defendants contend that injunctive relief against the Commodity Credit Corporation is barred under 15 U.S.C. § 714b(c), which provides that no injunction shall be issued against the CCC or its property.

The Court is not persuaded at this time that the anti-injunction provision prevents the Court from granting the relief sought by plaintiffs. The purpose of the anti-injunction provision was to avoid the implication of *FHA v. Burr,* 309 U.S. 242, 60 S.Ct. 488, 84 L.Ed. 724 (1940), which held that when Congress provides that an agency can "sue and be sued," it has consented to all civil process including garnishment and attachment. *Related Industries Inc. v. United States,* 2 Ct.Cl. 517, 521–23 (1983). The case at hand seeks only to prevent the agency's administrator from acting beyond the scope of the authority delegated to him; that is, to restrain him from misinterpreting the Cargo Preference Act. Under the Administrative Procedure Act,

this Court has authority to correct an agency's unlawful action. 5 U.S.C. § 706 et seq. (1976). Also, even if the type of injunction sought in this case against the administrator of the CCC were barred, declaratory relief (which plaintiffs also seek) would not be foreclosed. *See Worthington v. Commodity Credit Corporation,* 157 F.Supp. 497 (E.D.N.C.1957) (declaratory judgment not barred by § 714b(c)); *see also Mar v. Kleppe,* 520 F.2d 867 (10th Cir.1975) (upholding declaratory judgment against Small Business Administration despite "anti-injunction" provision in SBA Act identical to § 714b(c)). Furthermore, the anti-injunction provision of the CCC does not bar the entry of an injunction against the Secretary of Agriculture. *Mitchell v. Block,* 551 F.Supp. 1011, 1016 (W.D.Va.1982).

Still, the issue may be dealt with more thoroughly and directly in a challenge to the wording of the judgment, which the Court provides for in this decision, *see* Summary, *infra.* Accordingly, the Court withholds any explicit ruling on the effects of the anti-injunction provision at this time and invites further briefing on the issue.

Cong.Rec. H12523 (daily ed. Dec. 18, 1985) (remarks of Rep. Oberstar).

823 F.2d 1167.

Under the second point, plaintiffs point to numerous passages in the legislative history of the Act that they contend support the interpretation that the Act does not apply to instances, i.e. specific ports, where United States-flag ships are not available. *See* Plaintiffs' Brief in Support of Their Motion for Summary Judgment, at pages 118–144 (incorporated into Plaintiff's Summary Brief Upon Remand to the District Court, at 5, n. 4).

Under the administrative history of the Cargo Preference Act, plaintiffs contend that the position of the Agency for International Development (AID), as put forth in the June 28, 1984, legal opinion of the agency's general counsel and as put forth in the August 3, 1984, policy directive of the agency's administrator, explicitly acknowledges that the system for implementing Title II must avoid discriminating against the Great Lakes. This view suggests that the cargo from Great Lakes ships should be subtracted from the overall program totals when determining percentages. *See* Plaintiff's Brief in Support of Their Summary Judgment Motion, at 44–55; *see also* 634 F.Supp. 760, 762–63.

### 2. *Position of the Government Defendants*

The government defendants respond that their current interpretation and application of the Cargo Preference Act is reasonable and constitutes a "necessary and practicable" means of achieving compliance with the percentage mandated by the Act at the lowest possible cost. They contend that United States-flag vessels are "available" as long as they are offering to carry foreign aid cargoes to the specified destination at rates which are not excessive for such vessels—even if the port of departure is not the closet port to the location at which the commodities are procured. The defendants argue that the Court must defer to this "reasonable" interpretation, particularly in light of the fact that cargoes now can easily be transferred overland through the use of "containerization."

In response to the particular points raised by plaintiffs, the government defendants argue that (a) the decision of the Seventh Circuit does not support plaintiffs on the merits; and (b) the conclusions the plaintiffs seek to draw from the legislative and administrative history of the Cargo Preference Act are completely unfounded. As to the Seventh Circuit decision, the government defendants point out that while Congress' concern about the Great Lakes in 1985 may provide a basis for standing, it cannot show that the Availability Clause, enacted in 1954, was intended to protect the Great Lakes since foreign shipping was not a factor in the Great Lakes until after the St. Lawrence Seaway was opened in 1959. In regard to the legislative history of the Act, the government defendants describe the plaintiffs' interpretation as selective. The government defendants contend the legislative history establishes that Congress' intent was to assist the American merchant marine and that the Availability Clause was added to provide some flexibility and to avoid the payment of exorbitant rates for the United States-flag vessels. *See* Memorandum in Support of Defendants' Motion to Dismiss Or, In the Alternative, For Summary Judgment, at 46–53 (incorporated in Defendants' Response to Plaintiffs' Summary Brief Upon Remand to the District Court, at 9, n. 6).

### 3. *Position of Intervenor (Merchant) Defendants*

The intervenor defendants argue that (a) the plain meaning of the Cargo Preference Act requires the use of nationwide cargo preference compliance; (b) the legislative history does not support plaintiffs' reading of the Availability exception; and (c) the plaintiffs have not demonstrated that the agency charged with interpreting the Act has done so in an irrational manner.

A reading of the Act, according to intervenors, does not support plaintiffs' contention that the availability qualification prohibits the agency from measuring compliance on an annual, nationwide basis. They state that the only qualification in the wording is to limit the "necessary and practicable step" taken by an agency by requir-

ing that the actions be to the extent that such vessels are available at fair and reasonable rates for United States-flag commercial vessels.

The plaintiffs have not alleged, nor could they, that the steps taken by the agency, in the form of the rule currently in force, is not practicable. The agency is apparently able to meet its cargo preference requirement, and still meet the mandatory Great Lakes set aside [of the new statute].

Brief of Defendant–Intervenors on Remand, at 4–5.

On their second point, the intervenors contend that viewed in its entirety, the legislative history shows that Congress' principle concern in 1954 was ending potential abuses of the lowest landed cost criterion for escaping the Cargo Preference Act.

Finally, as to the agency's interpretation of the Act, the intervenors point out that under the well-settled principles of *Chevron, U.S.A., Inc., v. Natural Resources Defense Council*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984), an agency's construction of a statutory scheme it is entrusted to administer is entitled to great weight and, assuming the statute is ambiguous on the issue now before the Court, is controlling unless it is irrational.

### B. Analysis of the Court

In reviewing an agency's construction of a statute that the agency administers, a court begins by determining whether Congress has spoken directly to the precise issue before the court. *Chevron U.S.A. v. National Resource Defense Council*, 467 U.S. at 842, 104 S.Ct. at 2781. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–843 104 S.Ct. at 2781–82. If, however, a statute is silent or ambiguous with respect to the specific issue before the court, the question is whether the agency's answer is based on a permissible construction of the statute. *Id.* at 843, 104 S.Ct. at 2781–82.

In determining whether Congress has spoken directly on the issue of the applica-

tion of the Availability Clause, the Court first turns to the plain language of the statute. *United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed. 2d 246 (1981).

Indeed, in most instances, a court need not go beyond the words of the statute.... We look beyond the words Congress has chosen in only a limited number of circumstances. If the language of the act is ambiguous, we will examine the legislative history surrounding its enactment. We may not use the legislative history to create an ambiguity, however, for the words of the statute are usually the best indication of congressional intent. *See Turkette*, 452 U.S. at 593, [101 S.Ct. at 2533–34]. If the language of the act is unambiguous, only a " 'clearly expressed legislative intent to the contrary' " will lead to a different result. *Id.* at 580, [101 S.Ct. at 2527], (quoting *Consumer Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, [100 S.Ct. 2051, 64 L.Ed.2d 766] (1980)....

*United States v. Nichols*, 841 F.2d 1485, 1491–92 (10th Cir.1988); *see also United States v. Stein*, 690 F.Supp. 767, 771 (E.D. Wis.1988). Furthermore, a court should not construe a statute in a way that makes words or phrases meaningless, redundant of superfluous. *Zimmerman v. North American Signal Company*, 704 F.2d 347, 353 (7th Cir.1983).

Applying these standards to the case at hand, the Court finds that the government defendants' application of the Cargo Preference Act's Availability Clause on a nationwide basis is contrary to the plain words of the Act. The limiting language of the Act provides that the agency shall achieve the mandated percentage "to the extent such vessels are available at fair and reasonable rates for United States-flag commercial vessels, in such manner as will insure a fair and reasonable participation of United States-flag commercial vessels in such cargoes by geographic areas." The requirement that the agency act to insure a fair and reasonable participation by geographic area forecloses an application of

the Availability Clause based on straight nationwide participation. To hold otherwise would be to find meaningless the phrase, "by geographic areas." Also, if one considers availability on a national basis (for cost and location), then United States-flag ships will never be unavailable unless no United States-flag ships exist at any United States port—and the entire clause would become meaningless. The containerization advancement cited by the government defendants simply underscores this point.

Nationwide participation is precisely the basis used by the CCC in its current two-step bidding process. *See Procedural History and New CCC Regulations, Background* Part III, *supra.* No consideration whatsoever is made for geographic area, such as the Great Lakes, Gulf Coast or any other geographic area.

By the same token, however, the Court does not find that this language requires the Act to be applied on a port-by-port basis. Again, the inclusion of the language mandating that the agency judge participation by "geographic area" would run contrary to such an interpretation, unless one considers "geographic area" to refer to a specific port. The Court does not find such a narrow interpretation warranted by the wording of the Act.

The legislative history of the Act, if anything, supports the Court's interpretation. A review of the voluminous material cited by all parties leads the Court to conclude that while Congress intended to deter abuses of the previous so-called 50–50 legislation, an absolute, national 50–50 law was not intended. Consideration of situations where United States-flag ships were not available was undoubtedly a concern. 823 F.2d 1167 (and citations therein). Also, while many of the passages presented by the opposing sides support conflicting interpretations, flexibility appears to be the pervasive and persuasive view. As such, the legislative history does not contravene the language of the Act dictating that the agency's application be considered by geographic area.

The Court also would find that this flexibility does not manifest an intent by Congress that the Act be applied on a port-by-port basis. Nothing in the legislative history appears to require such a narrow interpretation in an effort to achieve this flexibility.

Therefore, the Court finds that the CCC's application of the Availability Clause on a nationwide basis for Title II purposes violates the language of the Cargo Preference Act that requires that such considerations be made on the basis of geographic area. The Court also finds that the CCC need not apply the Availability Clause on a port-by-port basis in order to comply with the language of the Act.

## II. *The Constitution's Port Preference Clause*

### A. Position of the Parties

#### 1. *Plaintiffs*

The Port Preference Clause of the Constitution provides that no preference shall be given by any regulation of commerce or revenue to the ports of one state over those of another. Art. I, § 9, Cl. 6. Plaintiffs claim that by misapplying the Cargo Preference Act, the government defendants have given a competitive advantage to the ports of the East, West and Gulf coasts, since the Great Lakes ports are precluded from competing for 75 percent of the Title II cargo due to the unavailability of United States-flag vessels on the Great Lakes. Plaintiffs also argue that the past diversions of cargo from the Great Lakes ports violate the Port Preference Clause.

#### 2. *Defendants*

Both the government defendants and the intervenor defendants respond that the new regulations are facially neutral and that any detriment to the Great Lakes is the result of geography, not discrimination. The government defendants also point out that the issue of the past diversions from Great Lakes ports is now moot in light of the new regulations. The intervenor defendants add that the clause is narrow and protects only individual states, not individual ports. As evidence of this narrowness, they point out that no government action in the history of the Constitution has been found to violate the provision.

## B. Analysis of the Court

■ "The purpose of the Port Preference Clause is to prevent Congress from imposing regulations that would give certain states a competitive advantage over other states." *City of Milwaukee v. Block*, 823 F.2d at 1168 (citing *Pennsylvania v. Wheeling & Belmont Bridge Company*, 59 U.S. (18 How.) 421, 434–35, 15 L.Ed. 435 (1856). Beyond this well-settled statement, the case law interpreting the clause is rare. *See City of Houston v. FAA*, 679 F.2d 1184, 1196 (5th Cir.1982) ("Decisions interpreting the clause are so few and far between that we must harken back to 1896—long before Wilbur and Orville Wright dreamed of defying gravity— to find the 'authoritative' case"). Both sides to this dispute rely on the following analysis used by the Fifth Circuit in *City of Houston*.

> Government actions do not violate the Clause even if they result in some detriment to the port of a state, where they occur (i) as an incident to some otherwise legitimate government act regulating commerce or (ii) more as a result of the accident of geography than from an intentional government preference.

679 F.2d at 1197.

Since this Court already has found that the new CCC regulations run contrary to the language of the Cargo Preference Act, the analysis of *City of Houston* breaks down somewhat. The detriment to Great Lakes shipping is not incident to an otherwise legitimate government act, it is incident to an invalid government act. But a constitutional violation under Port Preference Clause does not necessarily follow from a violation of the Cargo Preference Act, although in the case at hand the difference may be purely academic. The analysis in *City of Houston* establishes that the inquiry under the Constitution focuses on the direct privilege of the port of a particular state over the port of another state. *Id.* (discussing *Pennsylvania v. Wheeling and Belmont Bridge; South Carolina v. Georgia*, 93 U.S. (3 Otto) 4, 23 L.Ed. 782 (1876); and *Alabama Great*

*Southern Railroad v. United States*, 340 U.S. 216, 71 S.Ct. 264, 95 L.Ed. 225 (1951)).

Plaintiffs would have the Court find that the government defendants violated the Port Preference Clause simply by virtue of their misinterpretation of the Cargo Preference Act. But the Court is unpersuaded by this argument. The Cargo Preference Act and the CCC regulations giving it effect do not establish a specific government preference for the ports of a particular state over the ports of another. Under the new regulations [5]—where diversions of cargo are no longer made—the effect on the ports of the Great Lakes states is one of geography: United States-flag ships do not use the Great Lakes because the ports are closed in the winter, because the St. Lawrence Seaway is too narrow for United States-flag ships or simply because of cost. *See* Supplemental Declaration of Robert Sindt, Assistant Deputy Administrator in the Department of Agriculture, at ¶ 10. There is no direct preference for one port over another. Therefore, the Court declines to also find that the application of the Availability Clause on a nationwide basis for Title II purposes violates the Port Preference Clause of the Constitution.

## SUMMARY

The Court finds that the government defendants' application of the Availability Clause of the Cargo Preference Act on a nationwide basis violates the language of the Act's requirement that such an application be made by "geographic areas." The Court does not find, however, that the Act requires that the Availability Clause be applied on a port-by-port basis. Furthermore, the Court declines to find that on the basis of this statutory violation alone, the government defendants also have violated the Port Preference Clause of the Constitution.

On the basis of these findings, all of which were made as a matter of law, plaintiffs are entitled to the entry of judgment on their claims that the government defendants' actions were arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law, as alleged in

---

**5.** The Court agrees that the constitutionality of     the past diversions is now moot.

the First Cause of Action of the complaint. In order to facilitate the Court's entry of judgment, plaintiffs shall file with the Court within 20 days of the date of this decision, a proposed judgment. Plaintiffs may also submit a brief addressing any issue left unresolved by the Court's decision today. *See* n. 4, *supra.* Defendants shall submit responses to plaintiffs' filings within 20 days of service of plaintiffs' filing. Defendants' briefs may also address any issue left unresolved by the Court's decision and need not restrict itself to the issues raised by plaintiffs. Plaintiffs will then have 11 days from the service of defendants' filing within which to submit a reply.