STATE OF KANSAS, et al., Plaintiffs,

v.

UNITED STATES of America, et al., Defendants.

Civ. A. No. 91–0233.

United States District Court, District of Columbia.

June 30, 1992.

Robert T. Stephan, John W. Campbell, David J. Gallo, Office of the Attorney General, Topeka, Kan., for plaintiff, State of Kan.

David J. Gallo, Law Office of David Gallo, Dallas, Tex., for all plaintiffs other than the State of Kansas.

Jay Stephens, John D. Bates, John Martin, U.S. Attorney's Office, Washington, D.C., for defendants USA, Samuel K. Skinner.

Paul Geier, Thomas Ray, Dept. of Transp., Washington, D.C., for U.S. DOT, John V. Coleman.

Mark Hansen, Johnson & Gibbs, Washington, D.C., for intervenor American Airlines.

J.E. Murdock, III, Wanda Sobiski, Nicholas Volpe, Washington, D.C., for intervenor Dallas–Fort Worth Intern. Airport Bd.

## MEMORANDUM OPINION

JOHN H. PRATT, District Judge.

The case before the Court involves a constitutional challenge to a provision of the International Air Transportation Competition Act of 1979 ("International Competition Act"), P.L. 96–192, 94 Stat. 35, 48–49 (1980), that limits airline operations at Love Field, one of the Dallas-area airports. The provision, known as the Wright Amendment, restricts to Texas or its four contiguous states commercial passenger air traffic departing from or arriving at Love Field. All parties have filed motions for summary judgment. Because we find that the Wright Amendment is permissible economic regulation which does not violate either the Port Preference Clause or the First Amendment of the United States Constitution or the right to interstate travel, we grant defendants' and intervenors' motions

for summary judgment and deny plaintiffs'.

## I. *Background*

The Wright Amendment, named for its sponsor, Jim Wright, then majority leader of the House of Representatives, was added to the International Competition Act in order to resolve a long-standing dispute between the cities of Dallas and Fort Worth, Texas over the question concerning which of these two cities, closely related geographically, would have the regional airport.[1] Love Field is located 5—6 miles from Dallas, whereas Dallas–Fort Worth International Airport ("DFW"), the newer regional airport, is approximately 18 miles from the center of Dallas.[2] The Wright Amendment, Section 29 of the International Competition Act, represents a legislative determination that DFW should be the long-haul, major airport in the area. The Wright Amendment prohibits any air carrier from offering interstate flights with aircraft carrying more than 56 people at Love Field unless (a) the service existed on November 1, 1979, or (b) the service is provided by a flight to or from a point inside Texas and the four states bordering on Texas (Louisiana, Arkansas, Oklahoma, and New Mexico) ("Love Field Service Area").[3] Airlines may not operate flights

---

1. Both cities, which are located 31 miles apart, originally had their own airports, Love Field and Meacham Field. The two cities agreed to resolve their dispute by building a new airport, DFW, and consolidating most airline service there. After DFW opened in 1974, the eight certificated airlines that had been serving the area moved their operations to DFW. Southwest Airlines declined to move. *See City of Dallas v. Southwest Airlines Co.*, 371 F.Supp. 1015, 1019–21 (N.D.Tex.1973), *aff'd*, 494 F.2d 773 (5th Cir.), *cert. denied* 419 U.S. 1079, 95 S.Ct. 668, 42 L.Ed.2d 674 (1974).

2. The two airports are approximately 12 miles apart.

3. The Wright Amendment in full provides:

 SEC. 29. (a) Except as provided in subsection (c), notwithstanding any other provision of law, neither the Secretary of Transportation, the Civil Aeronautics Board, nor any other officer or employee of the United States shall issue, reissue, amend, revise, or otherwise modify (either by action or inaction) any certificate or other authority to permit or otherwise authorize any person to provide the

transportation of individuals, by air, as a common carrier for compensation or hire between Love Field, Texas, and one or more points outside the State of Texas, except (1) charter air transportation not to exceed ten flights per month, and (2) air transportation provided by commuter airlines operating aircraft with a passenger capacity of 56 passengers or less.

 (b) Except as provided in subsections (a) and (c), notwithstanding any other provision of law, or any certificate or other authority heretofore or hereafter issued thereunder, no person shall provide or offer to provide the transportation of individuals, by air, for compensation or hire as a common carrier between Love Field, Texas, and one or more points outside the State of Texas, except that a *person providing service to a point outside of Texas from Love Field on November 1, 1979*, may continue to provide service to such point.

 (c) Subsections (a) and (b) shall not apply with respect to, and it is found consistent with the public convenience and necessity to authorize, transportation of individuals, by air, on a flight between Love Field, Texas, and

or provide through service from Love Field to a point outside the Love Field Service Area, and may not allow passengers to interline on Love Field flights.[4] The Amendment states that airlines may not "offer for sale" transportation from Love Field to a point outside the Love Field Service Area. Department regulations prohibit an airline from advertising or volunteering information on service from Love Field to areas outside the Love Field Service Area, but do not prohibit an airline or travel agent from providing such information when a traveller asks for it.[5]

The Wright Amendment has been challenged before and has survived. As recently as May 9, 1991, the Fifth Circuit ruled that the Amendment did not violate the Constitution in *Cramer v. Skinner*, 931 F.2d 1020 (5th Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 298, 116 L.Ed.2d 242 (1991).[6] Additionally, this Circuit has previously upheld the validity of the Department of Transportation ("DOT") Order that implements the Amendment.[7] *See Continental*

*Air Lines, Inc. v. Department of Transportation,* 843 F.2d 1444 (D.C.Cir.1988).

## II. *Standing To Sue*

Before reaching the merits, we consider defendants' argument that plaintiffs lack standing. Plaintiffs in this action include the State of Kansas; the Wichita Airport Authority; Central College, Inc. (a travel agency); and nine individuals.[8] Defendants include the United States of America; Samuel Skinner; the United States DOT; John V. Coleman; and the Office of Aviation Analysis. Additionally, Dallas–Fort Worth International Airport Board and American Airlines, Inc. have been permitted to intervene.

When a court considers the issue of standing on a motion for summary judgment, the plaintiff must submit affidavits that indicate that a genuine issue of fact exists on this issue. *See Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 110 S.Ct. 3177, 3184, 111 L.Ed.2d 695 (1990). A party who invokes the court's authority must show that the party " 'personally has suf-

---

one or more points within the States of Louisiana, Arkansas, Oklahoma, New Mexico, and Texas by an air carrier, if (1) such air carrier does not offer or provide any through service or ticketing with another air carrier or foreign air carrier, and (2) such air carrier does not offer for sale transportation to or from, and the flight or aircraft does not serve, any point which is outside any such State. Nothing in this subsection shall be construed to give authority not otherwise provided by law to the Secretary of Transportation, the Civil Aeronautics Board, any other officer or employee of the United States, or any other person.

(d) This section shall not take effect if enacted after the enactment of the Aviation Safety and Noise Abatement Act of 1979.

4. Interline service is connecting service involving a change from one airline to another where each carrier agrees to accept tickets written for travel on it by another carrier and where the carriers provide for the transfer of baggage between flights. CAB Order 80–8–181 at 4 (Aug. 29, 1980). Through service means service provided between the ultimate origin and destination on a single ticket for a single sum fare. It also includes provision of service by connection between two flights. Love Field Amendment Proceeding, Dept. of Trans. Order 85–12–81 at 10 (Dec. 31, 1985), Defendants' Motion for Summary Judgment Ex. B.

5. The carrier may not display in a computer reservations system or list in its flight schedules, service from Love Field to a point beyond the Love Field Service Area. However, if customers are aware that such service is available, they can ask for it and be sold a double-ticketed service. "[I]t does not appear that Congress intended to preclude entirely the use of Love Field by passengers who take the effort to find out that double-ticketed service is available, who demand such tickets, and who accept the inconvenience of that service." Love Field Amendment Proceeding, Dept. of Trans. Order 85–12–81 at 12 (Dec. 31, 1985), Defendants' Motion for Summary Judgment Ex. B.

6. The Southern District of California has also dismissed a challenge to the Amendment on the ground that plaintiff lacked standing. *See Zamutt v. Skinner,* No. 90–0602–B(M), 1990 WL 430756 (S.D.Cal. Dec. 6, 1990).

7. The Circuit did not reach the merits of the claim that the restrictions on Love Field advertising violated the First Amendment's protection of commercial speech as the court held that the airline had not exhausted its administrative remedies. *See* 843 F.2d at 1445.

8. Debbie Cannaday, Bebe Daniels, Bernie Dworkin, A. John Hennessey, Jr., Mary Ann Lawing, Dorothy Lehman, Clifford Prescott, Charles Singleton, and Spencer Tepe.

fered some actual or threatened injury as a result of the putatively illegal conduct of the defendant.'" *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (quoting *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979)). The injury must be traceable to the challenged action and must be remediable by a favorable decision. *Id.* 454 U.S. at 472, 102 S.Ct. at 758. For the purposes of determining standing, we must assume the challenged conduct is unconstitutional or otherwise contrary to law. *See Warth v. Seldin,* 422 U.S. 490, 502, 95 S.Ct. 2197, 2207, 45 L.Ed.2d 343 (1975); *Cramer v. Skinner,* 931 F.2d 1020, 1025 (5th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 298, 116 L.Ed.2d 242 (1991).

Defendants challenge the standing of ten of the twelve plaintiffs to bring this case, but do not question the standing of the remaining two, Bebe Daniels and Bernie Dworkin. If either of these plaintiffs has standing to bring this case, even if all ten of the other plaintiffs lack standing, this Court still has jurisdiction to "entertain those common issues presented by all plaintiffs." *General Building Contractors Association, Inc. v. Pennsylvania,* 458 U.S. 375, 402 n. 22, 102 S.Ct. 3141, 3156 n. 22, 73 L.Ed.2d 835 (1982). *See also Watt v. Energy Action Educational Foundation,* 454 U.S. 151, 160, 102 S.Ct. 205, 212, 70 L.Ed.2d 309 (1981); *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 264 n. 9, 97 S.Ct. 555, 562 n. 9, 50 L.Ed.2d 450 (1977). Accordingly, we now turn to whether or not Daniels and Dworkin have asserted an injury sufficient to support standing.

■ Both Daniels and Dworkin have asserted three discrete injuries: 1) the deprivation of their First Amendment right to hear; 2) the deprivation of their fundamental right to travel; and 3) economic injury. Plaintiffs can establish standing if they can show a "substantial probability" that even one of their asserted injuries will be redressed by a favorable ruling. *See Larson*

*v. Valente,* 456 U.S. 228, 243 n. 15, 102 S.Ct. 1673, 1682 n. 15, 72 L.Ed.2d 33 (1982).

Bebe Daniels is a 80-year old widow who resides in close proximity to Love Field. *See* Declaration of Bebe Daniels in Support of Plaintiffs' Motion for Summary Judgment, or in the Alternative, for Partial Summary Adjudication ("Daniels Decl.") ¶ 3. Daniels claims that on her annual visit to Chicago, she travels via Love Field on Southwest Airlines because it is the least expensive carrier serving Dallas and Chicago. She alleges that on visits in 1989 and 1990 she was forced to disembark in Tulsa, Oklahoma, retrieve and recheck her luggage, and wait for at least 45 minutes before she could continue on her trip, because of the limitations imposed by the Wright Amendment. She further claims that on one occasion when returning from Chicago, she had to disembark the aircraft in Tulsa, even though the plane was continuing to her destination in Love Field. She states that "Southwest's employees politely informed me that they were forbidden by the Wright Amendment from allowing me to board Flight 43, because I had just arrived on a flight (*i.e.,* Flight 953) which had crossed the Restricted Borders." Daniels Decl. ¶ 17. Consequently, she had to await the next flight to Love Field, which left one hour and five minutes later. Daniels Decl. ¶ 19.

Bernie Dworkin, a resident of Dallas who is a frequent traveler outside of the Love Field Service Area, alleges that he believes Southwest provides the most inexpensive fares and that because of the Wright Amendment he is forced to either pay more to use a carrier that operates out of DFW or face "detention" at an intermediate airport. Declaration of Bernie Dworkin in Support of Plaintiffs' Motion for Summary Judgment, or in the Alternative, for Partial Summary Adjudication ("Dworkin Decl.") ¶ 8.

Both Daniels and Dworkin assert that they are dependent on airline personnel, travel agents, and printed media published by airlines in planning their trips and that the publication of single-sum fares and published schedules would help their travel

planning. Daniels Decl. ¶¶ 21–22; Dworkin Decl. ¶¶ 14–15.

## A. First Amendment

■ Plaintiffs assert that the Wright Amendment regulates the content of protected commercial speech and violates the right of individuals to receive such information. *See* Complaint ¶ 86. Daniels and Dworkin are limited by the Wright Amendment from learning of the availability of double ticketed service whereby they could fly from Love Field to a point outside the Love Field Service Area. They are not permitted to be told the total cost of such a trip as a single sum. The Wright Amendment also prevents the airline guide publication of connecting flight schedules, thereby preventing those passengers who know of the possibility of double ticketing from expediently planning their trip.

The abridgement of the First Amendment right to receive information is a judicially cognizable injury. *See Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 757, 96 S.Ct. 1817, 1823, 48 L.Ed.2d 346 (1976). As the Fifth Circuit noted in *Cramer v. Skinner*, the plaintiffs are "affected by the Love Field amendment's restrictions whenever [they plan] a trip beyond the Love Field service area." *Cramer*, 931 F.2d at 1027. The Fifth Circuit found that this injury placed the First Amendment claim in a "concrete factual context" that was conducive to realistic judicial appraisal. *Id.* (quoting *Valley Forge Christian College*, 454 U.S. at 472, 102 S.Ct. at 758.) We agree. Daniels and Dworkin have established that at the least they are hindered in their receipt of truthful information because of restrictions imposed by the Wright Amendment. Consequently, we find, as the Fifth Circuit did, that Dworkin and Daniels have alleged a sufficient injury to assert standing to litigate the First Amendment claim.

Assuming for the purposes of this analysis that the Wright Amendment and the DOT regulations do violate the plaintiffs' First Amendment right to receive information, we now look to whether a favorable ruling would redress the injury.

Southwest has indicated that in the absence of the statute it would advertise both the availability and the cost of service between Love Field and points beyond the Love Field Service Area. *See* Supplemental Statement of Material Facts as to Which Plaintiffs Contend There is No Genuine Issue ("Supplemental Facts") ¶ ac. Plaintiffs then would be able to comparison shop more easily, and would encounter greater flexibility in planning their travel. Thus, Dworkin's and Daniels' injuries are fairly traceable to the Wright Amendment. There is a substantial probability that a favorable decision would redress their injury.

## B. Right to Interstate Travel

■ It has long been settled that the Constitution protects the right to travel interstate. *See Attorney General of New York v. Soto–Lopez*, 476 U.S. 898, 901, 106 S.Ct. 2317, 2319, 90 L.Ed.2d 899 (1986). Plaintiffs Dworkin and Daniels allege that they have suffered an injury in fact because they have been "detained" at intermediate airports as a result of the Wright Amendment's prohibition on travel from beyond the Love Field Service Area to Love Field. Their declarations allege specific trips where they were required to disembark in an intermediate airport, reclaim luggage, and wait more than 45 minutes before they were permitted to continue on their journey to Love Field, even though there was an earlier flight that they could have taken. Dworkin also alleges an injury insomuch as he was denied access to a flight open to all passengers other than those from Love Field. We find that this is a sufficient actual injury that is fairly traceable to the challenged amendment. If not for the Wright Amendment, Dworkin and Daniels would not have had to reclaim baggage or take a connecting service flight other than the most convenient.

Further, there is reason to believe that plaintiffs' injuries would be redressed if they received a favorable decision. At the very least, plaintiffs would be allowed to

check their luggage through to their final destination, and they would not be subject to any "detention" period at intermediate airports. Southwest has also indicated that it would likely institute same-plane through service between Love Field and Chicago if the Wright Amendment were struck down.[9]

### C. Economic Injury

■ Similarly, the economic injuries which plaintiffs Dworkin and Daniels assert, while more intangible, are sufficiently concrete to provide standing. Daniels has asserted that the Wright Amendment prohibits discounted through fares, which has caused her financial harm. Dworkin claims that because of the wait between connecting flights he chose to fly to Phoenix from DFW instead of Love Field, and therefore that he had to pay a higher fare than he would have paid for double ticketed service from Love Field. Plaintiff has offered a deposition of Herbert Kelleher, the CEO of Southwest Airlines Co., who testified that it was substantially probable that if not for the Wright Amendment, Southwest would offer through fares, baggage checking, and nonstop service between Love Field and San Diego, Los Angeles, San Francisco, Phoenix and Las Vegas. Mr. Kelleher also testified that through fares were generally lower than the sum of point to point fares. *See* Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Cross Motions for Summary Judgment ("Plaintiffs' Opposition") Ex. A. at 27–31.

■ We conclude that plaintiffs Daniels and Dworkin have standing because they have sufficiently shown that they have suffered injuries, that their injuries are fairly traceable to the challenged conduct, and

that there is a substantial probability that they will be redressed by a favorable outcome.[10] Accordingly, we now turn to the merits of plaintiffs' challenge.

### III. *Challenges to the Constitutionality of the Wright Amendment*

Plaintiffs bring several constitutional challenges to the Wright Amendment. Specifically, they allege that it violates the Port Preference Clause, the right to travel interstate, and the First Amendment. We consider each in turn.

### A. Port Preference Clause

■ Plaintiffs contend that the Wright Amendment violates the Port Preference Clause by "establishing a direct preference for the ports of the Enumerated States over those of the Unenumerated States." Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Summary Judgment, or In the Alternative, for Partial Summary Adjudication ("Plaintiffs' Mem.") at 18.

The Port Preference Clause provides:

No Preference shall be given by any Regulation of Commerce or Revenue to Ports of One State over those of another: nor shall Vessels bound to, or from one State be obliged to enter, clear, or pay duties in another.

U.S. Const. art. I, § 9, cl. 6. The Clause has been interpreted only rarely over the last two hundred years, but the limited existing jurisprudence indicates that it operates as a narrow exception to Congress' power to regulate commerce.

---

**9.** *See* Supplemental Facts ¶ 1. The airline also indicated that it would offer non-stop, through, or connecting service between Love Field and a number of destinations. *See* Supplemental Facts ¶¶ j, n, p, r, t, x.

**10.** We note too, that the State of Kansas has standing to bring this challenge in its capacity as an employer even though it cannot not bring this suit against the federal government as *parens patriae, see Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 610 n. 16, 102 S.Ct. 3260, 3270 n. 16, 73 L.Ed.2d 995 (1982). It has alleged sufficient pecuniary injury as it must

pay twice the double ticketed fare to Love Field to fly to DFW, or be forced to disembark the plane at an intermediate station if flying to Love Field (on government time). This injury is traceable to the Wright Amendment. Further, as Southwest has indicated that there is a substantial probability that it would initiate non-stop service between Love Field and Kansas City International Airport, Supplemental Facts at ¶ K, there is a substantial probability that injury would be redressed. Therefore, the state has asserted a judicially cognizable injury which is likely to be redressed by a favorable decision.

Plaintiffs make an ambitious argument because we can find no case in which the Port Preference Clause has been used to strike down an act of Congress. Although the case law and legislative history offer some support for plaintiffs' argument that the Port Preference Clause prohibits precisely this type of statute—one that discriminates on the basis of states *qua* states—we believe that the Port Preference Clause has been rendered almost a historical nullity. As we find that the Wright Amendment was enacted incident to Congress' well-established power to regulate air transportation, and as there is no evidence that any impermissible motive led to the adoption of the four state Love Field Service Area, we hold that the Wright Amendment does not violate the Port Preference Clause of the United States Constitution. The following discussion is illuminating not only as to the history and origins of the Clause but also as to its treatment in the Courts.

The Port Preference Clause was originally enacted to calm the fears of Maryland that Virginia would use its political clout to force ships bound for Maryland to stop and clear customs at Norfolk, Virginia, before entering the Chesapeake Bay. *See City of Milwaukee v. Yeutter*, 877 F.2d 540, 545 (7th Cir.), *cert. denied*, 493 U.S. 976, 110 S.Ct. 500, 107 L.Ed.2d 503 (1989) (citing 2 The Records of the Federal Convention of 1787 at 417 (Max Farrand ed. rev. ed. 1966)

("Federal Convention Records")). Although the language adopted at the Convention was weaker than some preferred, it is well established that the goal of the clause was to prevent the national government from explicitly privileging the port and related duty collection of certain states.[11] It was originally proposed with the Uniformity Clause, Art. I, § 8, cl. 4., and "reported out of a special committee as an interrelated limitation on the National Government's commerce power". *United States v. Ptasynski*, 462 U.S. 74, 80 n. 10, 103 S.Ct. 2239, 2243 n. 10, 76 L.Ed.2d 427 (1983) (citing 2 Federal Convention Records at 437). *See also Knowlton v. Moore*, 178 U.S. 41, 104, 20 S.Ct. 747, 772, 44 L.Ed. 969 (1900) (two clauses had the same significance).

■ In the two hundred-odd years since its adoption, the Port Preference Clause has been interpreted only rarely, and then, under its most narrow construction. Indeed, we must go back to the year 1856, almost a century and a half ago, to find the leading case on the Port Preference Clause. In *Pennsylvania v. Wheeling and Belmont Bridge Co.*, 59 U.S. (18 How.) 421, 15 L.Ed. 435 (1856), Pennsylvania challenged the construction of a bridge over the Ohio River near Wheeling, West Virginia. Pennsylvania contended that the low height of the bridge discouraged river traffic from continuing up river to Pitts-

---

**11.** Luther Martin, the proponent of the clause, noted its importance:

> This provision, as well as that which relates to the uniformity of impost duties and excises, was introduced, Sir, by the delegation of this State. Without such a provision, it would have been in the power of the general government to have compelled all ships sailing into or out of the Chesapeake, to clear and enter at Norfolk, or some port in Virginia; a regulation which would be extremely injurious to our commerce, but which would, if considered merely as to the interest of the Union, perhaps not be thought unreasonable; since it would render the collection of the revenue arising from commerce more certain and less expensive.

3 Federal Convention Records App. A, CLVIII at ¶ 67. But Martin was displeased with the final version, as it permitted the Federal government to regulate the ports indirectly. As the Seventh Circuit noted in *City of Milwaukee v. Yeutter*,

> Luther Martin, the force behind the Clause, was not satisfied and went into opposition after the Convention. Martin complained that the Clause dealt only with express preferences and left states to bear the effects of other rules. He expressed greatest concern about Congress' power to designate some places as customs ports to the exclusion of others.... Hyperbole from opponents must be used with care, but Martin, as the proponent of the Port Preference Clause, was in the ideal position to know what he had and hadn't obtained from his colleagues at the Convention; he wanted, and couldn't get, a ban on disparate impact. For two hundred years, courts have understood that only explicit discrimination violates the Port Preference Clause, and this dooms Milwaukee's argument.

877 F.2d at 546.

burgh and that Congress' explicit approval of the construction of the bridge thereby violated the Port Preference Clause. The Supreme Court found that the construction of the bridge did not violate the Port Preference Clause. The Supreme Court interpreted the clause narrowly, finding that it did not prohibit regulation that had disparate effects on various ports, but only those acts which directly discriminated against states:

Indeed, the clause, in terms, seems to import a prohibition against some positive legislation by Congress to this effect, and not against any incidental advantages that might possibly result from the legislation of Congress upon other subjects connected with commerce, and confessedly within its powers ... The truth seems to be, that what is forbidden is, not discrimination between individual ports within the same or different states, but discrimination between states; and if so, in order to bring this case within the prohibition, it is necessary to show, not merely discrimination between Pittsburgh and Wheeling, but discrimination between the ports of Virginia and those of Pennsylvania.

59 U.S. at 433–35. Later cases have supported this approach. As it has been interpreted, the Port Preference Clause does not bar statutes regulating commerce that incidentally operate to the prejudice of the ports in a neighboring state, but it forbids discrimination between states. *See, e.g., Louisiana Public Service Commission v. Texas & New Orleans R.R.*, 284 U.S. 125, 131, 52 S.Ct. 74, 76, 76 L.Ed. 201 (1931); *Armour Packing Co. v. United States*, 209 U.S. 56, 80, 28 S.Ct. 428, 435, 52 L.Ed. 681 (1908); *South Carolina v. Georgia*, 93 U.S. 4, 13, 23 L.Ed. 782 (1876). Similarly, facially neutral statutes that disparately affect states do not violate the clause. *See Alabama Great Southern R.R. v. United States*, 340 U.S. 216, 229, 71 S.Ct. 264, 272, 95 L.Ed. 225 (1951).

This is not the first time that the Port Preference Clause has been used in an attempt to challenge airport perimeter rules. In *City of Houston v. Federal Aviation Administration*, 679 F.2d 1184 (5th

Cir.1982), the Fifth Circuit upheld a F.A.A. regulation that prohibited the use of National Airport for non-stop flights to cities that were more than 1,000 miles from Washington, D.C. After reviewing the Port Preference Clause jurisprudence, the Fifth Circuit distilled the parameters of the Port Preference Clause as it has been interpreted by the Supreme Court:

Government actions do not violate the Clause even if they result in some detriment to the port of a state, where they occur (i) as an incident to some otherwise legitimate government act regulating commerce or (ii) more as a result of the accident of geography than from an intentional government preference.

679 F.2d at 1197. The Fifth Circuit upheld the 1,000 mile perimeter rule for Washington National Airport, noting that the rule was facially neutral, and that it did not discriminate against any particular state. *Id.* at 1198.

In *Cramer v. Skinner*, 931 F.2d 1020 (5th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 298, 116 L.Ed.2d 242 (1991), the Fifth Circuit relied on the prior *City of Houston* and found that the Wright Amendment satisfied both prongs of the test. The Circuit held that the Wright Amendment was enacted incident to Congress' regulation of interstate airline service and "pursuant to its rational decision to maintain the agreement between Dallas and Fort Worth," 931 F.2d at 1032, and that the four states preferred by the Amendment were preferred as an accident of geography rather than as the result of an intentional government preference. *Id.*

Cramer has not demonstrated that Congress deliberately discriminated against the 45 states not bordering on Texas by requiring travelers from such states to use DFW if they wish to travel to Dallas–Fort Worth on a nonstop or "through" ticket.

931 F.2d at 1032 n. 14.

The Wright Amendment was enacted pursuant to the government's power to regulate air transportation and to resolve a long-standing dispute that had impeded development of the region's air resources.

It does not require that all flights from Kansas to Texas first stop in one of the four contiguous states; it only conditions those heading to or leaving from Love Field. Nothing is stopping flights from Kansas from flying directly to DFW, only a few miles from Love Field.[12]

Finally, while the choice of the surrounding states as the Love Field Service Area rather than a straight distance perimeter rule may be a less desirable alternative, it is not unconstitutional. As other courts have noted, any perimeter rule is by its nature somewhat arbitrary.[13] There is no evidence that Congress chose these four states with any evil motive, or for any reason other than they were the closest ones. The use of political boundaries in lieu of geographical ones does not, without more, turn an otherwise permissible "accident of geography" into an impermissible use of state power. This would be elevating form over substance.

As an initial proposition, plaintiffs make a compelling argument that the Port Preference Clause, as it was enacted, was designed to prevent this type of legislation. However, it has not so been interpreted by the courts of this land. In the end, we are forced to agree with Justice Holmes who said: "Upon this point a page of history is worth a volume of logic." *New York Trust Co. v. Eisner*, 256 U.S. 345, 349, 41 S.Ct. 506, 507, 65 L.Ed. 963 (1921). We hold that the Wright Amendment does not violate the Port Preference Clause of the Constitution.

**B. Right to Travel Interstate**

■ Plaintiffs also argue that the Wright Amendment violates the right to travel interstate by creating an impermissible classification based upon the exercise of a fundamental right. *See* Plaintiffs' Mem. at 29–30. We do not accept this contention. Instead, we hold that the Wright Amendment is not an unconstitutional violation of the right to interstate travel because it is a minor restriction, and furthers legitimate governmental goals.

" ' 'Freedom to travel throughout the United States has long been recognized as a basic right under the Constitution.' ' " [14] Although the textual support for this right has been located in various provisions of the Constitution,[15] "[w]hatever its origin, the right to migrate is firmly established and has been repeatedly recognized ...". *Attorney General of New York v. Soto-Lopez*, 476 U.S. 898, 903, 106 S.Ct. 2317, 2320–21, 90 L.Ed.2d 899 (1986) (plurality opinion).

■ Where the fundamental right to travel is implicated, a statute can be upheld only if it is supported by a showing of compelling interest on the part of the government. *See* 476 U.S. at 904, 106 S.Ct. at 2321. However, not every restriction on travel operates to implicate the fundamental right. *See id.* at 903, 106 S.Ct. at 2321 (state law implicates the right to travel when it actually deters such travel, when impeding travel is its primary objective, or when it uses any classification which serves to penalize the exercise of that right); *Jones v. Helms*, 452 U.S. 412, 423,

---

**12.** The Port Preference Clause has been construed so narrowly that we think only a statute that required all planes leaving or entering Texas to first land in one of the contiguous states would violate the Port Preference Clause. Even then the Fifth Circuit's interpretation might permit such an act if the requirement were incident to "some otherwise legitimate act regulating commerce."

**13.** *See, e.g., Cramer v. Skinner*, 931 F.2d 1020, 1031 (5th Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 298, 116 L.Ed.2d 242 (1991); *City of Houston v. Federal Aviation Administration*, 679 F.2d 1184, 1193 (5th Cir.1982); *Western Air Lines, Inc. v. Port Authority*, 658 F.Supp. 952, 958–959 (S.D.N.Y.1986), *aff'd,* 817 F.2d 222 (2d Cir.1987),

*cert. denied,* 485 U.S. 1006, 108 S.Ct. 1467, 99 L.Ed.2d 697 (1988).

**14.** *Attorney General of New York v. Soto-Lopez,* 476 U.S. 898, 901, 106 S.Ct. 2317, 2320, 90 L.Ed.2d 899 (1986) (quoting *Dunn v. Blumstein,* 405 U.S. 330, 338, 92 S.Ct. 995, 1001, 31 L.Ed.2d 274 (1972) (quoting *United States v. Guest,* 383 U.S. 745, 758, 86 S.Ct. 1170, 1178, 16 L.Ed.2d 239 (1966)) (plurality opinion).

**15.** *See* 476 U.S. at 902, 106 S.Ct. at 2320 (noting that the right has been located in the Privileges and Immunities Clause of Article IV, the Commerce Clause, the Privileges and Immunities Clause of the Fourteenth Amendment, and the federal structure of the government).

**1052**

101 S.Ct. 2434, 2442, 69 L.Ed.2d 118 (1981).[16] The relevant question is not only the extent of the governmental restriction involved, but also the necessity for the restriction. *See Zemel v. Rusk,* 381 U.S. 1, 14, 85 S.Ct. 1271, 1279, 14 L.Ed.2d 179 (1965).

The Wright Amendment operates only as an inconsequential impediment to the right to travel and does not implicate the fundamental right. The Wright Amendment does not prohibit interstate travel, it merely makes it slightly more of a hindrance for those travelers who insist on using Love Field. As the Fifth Circuit noted in *Cramer,* "The Love Field Amendment does not bar travelers from distant cities from using Love Field. Rather, just as the perimeter rule at issue in *City of Houston,* it makes travel less convenient for such passengers. Love Field remains attractive for many long-distance travelers, ... despite the statutory restrictions." 931 F.2d at 1030. There is no constitutional right to the most convenient form of transportation.[17] No one is prevented from travelling to any state in the Union by the Wright Amend-

ment; they are merely restricted from using one airport to do so.[18] Nor is anybody completely prevented from using Love Field to travel beyond the Love Field Service Area: the Wright Amendment merely delays their departure for a short period. "[N]ot all waiting periods are impermissible."[19] If anyone wants to fly into Texas they can do so; if they insist on flying into Love Field, they can also do so, but with some restrictions. The Wright Amendment merely makes some travel less convenient for some residents, but it does not prevent them from exercising their right to travel interstate.[20]

Further, Congress imposed the Wright Amendment for rational reasons: to legislatively support a dispute resolution reached by the two cities. The perimeter rule reinforced the development of DFW into the leading airport in the area, and indeed one could argue (as defendants do) that the Wright Amendment was designed to facilitate interstate travel.

Consequently, we find that the Wright Amendment does not impermissibly infringe on the right to interstate travel.[21]

**16.** *See also Attorney General of New York,* 476 U.S. at 921, 106 S.Ct. at 2330–31 (O'Connor, J., dissenting) ("As the plurality implicitly recognizes, it is fair to infer that something more than a negligible or minimal impact on the right to travel is required before strict scrutiny is applied."); *Memorial Hospital v. Maricopa County,* 415 U.S. 250, 256–257, 94 S.Ct. 1076, 1081, 39 L.Ed.2d 306 (1974) ("The amount of impact required to give rise to the compelling-state interest test was not made clear."); *Cramer,* 931 F.2d at 1031 ("Minor restrictions on travel simply do not amount to the denial of a fundamental right that can be upheld only if the Government has a compelling justification").

**17.** 931 F.2d at 1031; *City of Houston v. Federal Aviation Administration,* 679 F.2d 1184, 1198 (5th Cir.1982) ("At most, their argument reduces to the feeble claim that passengers have a constitutional right to the most convenient form of travel. That notion, as any experienced traveler can attest, finds no support whatsoever in *Shapiro* or in the airlines' own schedules").

**18.** *Cf. Anderson v. USAir, Inc.,* 818 F.2d 49, 56 (D.C.Cir.1987) ("But, as to the federal government, it is well established that a policy intimately related to interstate air travel would not exceed the scope of the commerce clause"; indicating that policy that prevented disabled passenger from seating in emergency rows would

not violate right to travel as seats were offered in nonemergency rows).

**19.** *Attorney General of New York,* 476 U.S. at 905 n. 5, 106 S.Ct. at 2322 n. 5 (discussing *Sosna v. Iowa,* 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975), which found that a one-year residency condition for maintaining an action for divorce did not impermissibly violate the right to migrate).

**20.** Of course, a different result would be required if Love Field were the only airport in Texas. Then, a congressional enactment that limited the flights from that airport to certain states would clearly implicate the right to interstate travel.

**21.** Plaintiffs also argue that the Wright Amendment infringes on the First Amendment right of association. They recall the freedom riders and the civil rights workers to claim that prohibiting travel can deter people from associating with whomever they want. They argue that if the Wright Amendment is permissible, precedent in this case could be used to support "some future congress or president to suppress dissent against some future declared or undeclared war, some future tax, or some other action of government, through the enactment of facially innocuous restraints on travel between the states." Plain-

## C. First Amendment

 Plaintiffs' final claim is that the Wright Amendment impermissibly abridges the First Amendment by limiting protected commercial speech. This claim was also asserted to support plaintiffs' assertion of their standing to sue. Commercial speech is that speech which proposes a commercial transaction. *See Board of Trustees v. Fox,* 492 U.S. 469, 473–74, 109 S.Ct. 3028, 3031, 106 L.Ed.2d 388 (1989); *Posadas de Puerto Rico Associates v. Tourism Co. of Puerto Rico,* 478 U.S. 328, 340, 106 S.Ct. 2968, 2976, 92 L.Ed.2d 266 (1986). There is no doubt that the speech at issue here, the advertising of flights available from Love Field, proposes a commercial transaction and is commercial speech.

 To analyze the lawfulness of restrictions on commercial speech, the Supreme Court has indicated that the proper approach is first to

'determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.'

*Board of Trustees,* 492 U.S. at 475, 109 S.Ct. at 3032 (quoting *Central Hudson Gas & Electric Corp. v. Public Service Comm'n,* 447 U.S. 557, 566, 100 S.Ct. 2343, 2351, 65 L.Ed.2d 341 (1980)). As no party has alleged that the speech at issue here does not concern lawful activity or is misleading, we will assume that the speech at issue is protected by the First Amendment.

We next turn to whether the asserted governmental interest is substantial and whether the regulation is broader than is necessary to serve that interest. The defendants assert that the government's interest was to resolve the differences between Dallas and Fort Worth in developing a regional airport. *See also* H.R.Conf.Rep. No. 716, 96th Cong., 1st Sess. 24–26 (1979) ("Perhaps the most important point about section 29 is that it provides a fair and equitable settlement for a dispute that has raged in the Dallas/Fort Worth area for many years"). This is a substantial governmental interest. It is beyond question that Congress has the power to regulate air transportation in this country, and the development of airports falls squarely within that ambit. The Wright Amendment serves to finally resolve a dispute that had prevented the region from developing its resources.

The Wright Amendment directly advances the interest asserted by reducing demand for air travel from Love Field. Lack of advertising will lead to a lack of consumer awareness, and while it is not a particularly attractive government goal to keep consumers in the dark, a ban on advertising available services will further the interest in promoting DFW to the exclusion of Love Field. *See Posadas de Puerto Rico Associates v. Tourism Co. of Puerto Rico,* 478 U.S. 328, 342, 106 S.Ct. 2968, 2977, 92 L.Ed.2d 266 (1986) (prohibiting casino advertising would further government's interest in reducing demand); *Central Hudson Gas & Electric Corp. v. Public Service Comm'n,* 447 U.S. 557, 569, 100 S.Ct. 2343, 2353, 65 L.Ed.2d 341 (1980) ("There is an immediate connection between advertising and demand for electricity.") Nor is the statute more extensive than necessary to serve the interest. It does not prohibit the knowledgeable consumer from receiving the information she seeks upon request.

 The restriction on speech does not have to be the least restrictive available.

tiffs' Mem. at 38. Plaintiffs argue that under First Amendment analysis, restraints on interstate travel should be considered as analogous to restraints on speech and restrictions on travel conditioned on crossing state lines should be similar to content restriction. While this is an interesting argument, we feel no need to extend the law in this direction. Plaintiffs have introduced no evidence that the Wright Amendment was enacted to curtail the associational or speech rights of any traveler, nor any evidence that it in fact does so. Consequently, we reject this approach. *See Cramer,* 931 F.2d at 1032–33.

Instead, there must be a " 'fit' between the legislature's ends and the means chosen to accomplish those ends." *Board of Trustees,* 492 U.S. at 480, 109 S.Ct. at 3034 (quoting *Posadas,* 478 U.S. at 341, 106 S.Ct. at 2976). There is clearly such a fit here as the advertising restrictions will lead more people to fly through DFW than would be the case if they knew service was available through Love Field.

Accordingly, we find that the Wright Amendment's restrictions on commercial speech do not impermissibly abridge the First Amendment.

In conclusion, we join the Fifth Circuit to find that the Wright Amendment does not violate the Constitution. We therefore grant defendants' and intervenors' motions for summary judgment and deny plaintiffs' motion.